MARTHA E. WALKER and MYRTIE E. MAST, Appellants, v. WILLIAM T. BOHANNAN, JOHN BOHANNAN et al.

#### Division One, May 31, 1912.

1. **STATUTE OF FRAUDS: Exceptions.** Title to real estate should not slumber in oral contracts to convey. A parol contract to convey real estate is an exception which courts of equity have engrafted on the Statute of Frauds and Perjury, requiring all such contracts to be in writing; but they will be allowed only when the very conscience of the court is touched by the facts of the particular case, and a fraud, such as the statute was designed to avoid, would be perpetrated unless the exception were made.

2. ———: ———: **Proof.** The rules to establish a parol contract to convey real estate cover many phases; as, for example: (1) The alleged oral contract must be clear, explicit and definite; (2) it must be proven as pleaded; (3) it cannot be established by conversations either too ancient or too loose or casual; (4) it must be fair and not unconscionable; (5) the proof must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as pleaded was in fact made and fully performed, as far as performance lay in the hands of the parties; (6) the acts constituting performance must be such as to be referable solely to the contract, and not such as might be referable to some other or a different contract; (7) the contract must be based upon an adequate and legal consideration, so that its performance upon the one hand but not upon the other would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; and (8) proof of a mere disposition to devise by will or convey by deed, by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed, made before the acts of performance relied on were done.

Walker v. Bohannan.

3. ————: Specific Performance of Oral Contract: Not Communicated to Plaintiffs. Testimony that deceased said to plaintiffs' father (two young women or girls) that if they would come and live with him and take care of him while he lived they should have all his property upon his death, is of little value, if there is no showing that such proposal was communicated to plaintiffs prior to the time they went to the house of deceased to live.

4. ————: ————: Contract Pleaded and Proven. Proof that if plaintiffs would come and live with deceased as long as he lived "this place would be theirs" is not proof of the contract alleged that if they would do those things "he would give said plaintiffs all his property." Neither is testimony that if they would stay with him as long as he lived "what he had left would be theirs." To obtain specific performance of a parol contract to convey land the contract pleaded must be the contract proven. Proof of a contract to give a farm is not proof of a contract to convey all of one's property. Nor is proof that he would give what he had left at his death proof of a contract to give all the property he had when the contract was made.

5. ————: ————: ————: Agreement to Devise. Testimony that deceased said "what property he had he .intended for plaintiffs" but expresses an intention to convey by devise or deed, but does not show a contract to do either.

6. ————: ————: ————: Referable to Other Matters. Where the blind owner of land made the contract with the father of plaintiffs, one of whom was a young widow and the other a fourteen-year-old girl, and the whole evidence shows that they did nothing about the place which is not referable to their relations to their father, who was himself an invalid, it will not be held that such acts of performance were done solely under a contract with plaintiffs that, if they would move into deceased's house, with their father, and take care of deceased while he lived, he would give them all his property.

Appeal from Nodaway Circuit Court.—*Hon. W. C. Ellison*, Judge.

AFFIRMED.

*Cook, Cummins & Dawson* and *A. F. Harvey* for appellants.

(1) The evidence in this case is clear and positive and amply meets every requirement of the law as to the making and performance of the contract and

fully justifies the court in enforcing the contract in suit.  Forrister v. Sullivan, 231 Mo. 345; Collins v. Harrel, 219 Mo. 279; Kirk v. Middlebrook, 201 Mo. 291; Berg v. Moreau, 199 Mo. 416; Lynn v. Hockaday, 162 Mo. 125; Alexander v. Alexander, 150 Mo. 594; Hall v. Harris, 145 Mo. 614; Sutton v. Hayden, 62 Mo. 101; Gupton v. Gupton, 47 Mo. 37.  (2)  The removal of plaintiffs from the Dooley farm, where they lived at the time the contract sued on was made, to the Bohannan farm, and the faithful performance of the contract by plaintiffs, in a manner entirely satisfactory to Tilman C. Bohannan, the other party to the contract, for a period of over six years is sufficient consideration.  Berg v. Moreau, 199 Mo. 416; Sutton v. Hayden, 62 Mo. 114; Typewriter Co. v. Realty Co., 220 Mo. 522; Williams v. Jenson, 75 Mo. 681; Lindell v. Rokes, 60 Mo. 249; 6 Am. and Eng. Ency. Law (2 Ed.), 703.

*Shinabargar, Blagg & Ellison* for respondents.

In urging an affirmance of the judgment and decree of the trial court in this case, we place our reliance on the same cases cited by appellants, together with a few others which are no stronger, but which merely show that the law on this subject announced in the latest decisions of this court, has its foundation in an unbroken line of decisions to the same effect. A more complete list of these recent cases on specific performance of parole contracts would include the following:  Forrister v. Sullivan, 231 Mo. 345; Collins v. Harrell, 219 Mo. 279; Wales v. Holden, 209 Mo. 552; Kirk v. Middlebrook, 201 Mo. 289; Berg v. Moreau, 199 Mo. 416; Russell v. Sharp, 192 Mo. 285; Rosenwald v. Middlebrook, 188 Mo. 58; Grantham v. Gossett, 182 Mo. 651; Ashbury v. Kirklin, 181 Mo. 658; McKee v. Higbee, 180 Mo. 263; McElwain v. McElwain, 171 Mo. 244; Kinney v. Murray, 170 Mo. 674;

Lynn v. Hockaday, 162 Mo. 111; Steele v. Steele, 161 Mo. 566; Alexander v. Alexander, 150 Mo. 579; Hall v. Harris, 145 Mo. 614. The Forrister case contains rules applicable to cases in which it is sought to enforce a parole contract in the teeth of the Statute of Frauds. The announcement there is simply a more explicit statement of the doctrine laid down in Kirk v. Middlebrook, 201 Mo. 289, and quoted with approval in Collins v. Harrell, 219 Mo. 318.

GRAVES, P. J.—Action for the specific performance of an alleged oral contract to convey land. The petition avers the contract in this language: "That on or about said date Tilman C. Bohannan, who was then and there blind and unable to see, and who was living alone on said above described lands, and unable to take care of himself, then and there mutually agreed with the plaintiffs that if they would move on his said farm, together with their father, and permit him to reside in their family and render him such care and services in sickness and in health as were necessary, he being blind, until his death, he would give said plaintiffs all his property." The petition then avers full performance of the contract upon the part of the plaintiffs.

By answer the defendants admitted the ownership of the land involved by Tilman C. Bohannan in his lifetime, but deny all other allegations of the petition. The trial court found for the defendants, and from such adverse judgment the plaintiffs have appealed. The case calls for a full *resume* of the evidence.

Tilman C. Bohannan died in November, 1907. The alleged contract was made in April, 1901. For years prior to his death Bohannan had been totally blind, but otherwise was a hale and hearty man for his years. Although blind he could go around without much assistance, and did many things about his little

farm of forty-seven acres. His death was the result of a stroke of apoplexy. He had complained of feeling bad for but a few days before his stroke. The care demanded by him, as indicated by the evidence, was much less than is usually the case with blind people, and much less than one would expect. The two turning points in the case are (1) whether the contract as alleged is sustained by the required quantum of proof, and (2) whether the things done by the plaintiffs are referable to this contract, or to another admitted contract which Bohannan had with the father of the plaintiffs.

For three years prior to April, 1901, John Mast, the father of plaintiffs, had lived upon the land in question. Most of the time his wife and the plaintiffs lived with him. In 1900 the wife died, and one daughter married. In the early spring of 1901 the husband of Martha died, and John Mast, with the daughter Myrtie, removed from the Bohannan place to a place where the daughter Martha lived. This was about a month before the alleged April contract. During the prior three years Mast had lived there under a contract to the effect that he was to have the use of the farm and in return therefor was to board Bohannan and in addition pay him fifty dollars per year. Early in April Bohannan sent word to Mast to come over and see him as he wanted to talk to them or him. In response to this request John Mast and his daughter Myrtie, then nearly fourteen years old, went over and a talk was had between John Mast and Mr. Bohannan about coming back to the Bohannan farm. The girl Myrtie was in an adjoining room. One clear result of this conversation was an agreement by which John Mast was to take the farm upon the same terms as he had occupied it before, i. e., Mast to board Bohannan and pay him fifty dollars per year for the use of the farm. This contract is not controverted. It should

be stated here that Bohannan was an uncle of John Mast's wife, then deceased.

We shall assemble the testimony as to the alleged contract, as it appears from the record.

John Mast said:

"Q. What did he say with reference to these girls and the land? That is what I want to know? A. He said if the girls stayed with him and took care of him as long as he lived, when he was done with it, it should be theirs.

"By the Court: How? A. He said that if the girls stayed with him as long as he lived, and taken care of him; when he was done with it, it should be theirs. This is all I know about it.

"By the Court: Well, I will get him to state it over again, and state it slowly, and don't say 'we.' Name the people. I will get you to go down and fix your attention on the moment of time that you entered his home. Now tell again what took place. A. Well, we were talking, as I told you before—if I would come back there, just as I was before I went away—that is, I was paying him fifty dollars a year for the use of the place, and kept him—that is, fed him."

"By the Court: That is, boarded him? A. Yes, sir; boarded him.

"By the Court: Then what? A. And then he said that, if the girls stayed with him as long as he lived, what was left should be theirs. Now that is just as near, about, as I know how to make it—Myrtie and Martha."

On the question of performance of the contract this witness said:

"Q. Now after you went back there, you may state to the court what, if anything, these girls, Myrtie Mast and Martha Walker—what they did with reference to the care and attention given to Tilman C. Bohannan? A. Well, they done all the work that was necessary for the women to do about the farm

and about the place there—the washing, the cooking and so forth—and waiting on Uncle, you know. Sometimes he would lose things, when he would be out of doors, and he couldn't find it, of course he couldn't see.

"Q. You mean by 'Uncle' Uncle Tilman C. Bohannan? A. Uncle Bohannan. Yes.

"Q. What other things did they do, with reference to care and attention? A. They just give him his care, you know. Of course, you know that they had to wait on him at the table. Anybody knows about that. A blind man can't help himself at the table.

"By Mr. Blagg, Counsel of Defendants: Wait a minute now. Don't argue the case. Tell the facts. A. Well, he couldn't wait on himself at the table, and of course we had to wait on him—me or the girls.

"Q. State whether or not these girls did that? A. Yes, sir.

"Q. Now state what else they did for him, if you recall, as to care and attention. A. They waited on him; and the work there, to keep up the place; and all these things, you know; and keep the house in order—is about all, you know, that women can do, I think. They done everything that a woman could do, in regard to—

"Q. Where did Tilman C. Bohannan live, after you went there in April, 1901, up to the time of his death? A. He lived there with I and the girls.

"Q. Continuously? A. Yes, sir.

"Q. State whether or not the care and attention that you have spoken of was given to him continuously from the time you went there in 1901 up until the time of his death? A. Yes, sir."

John Hughes, who carried the message from Bohannan to the Masts, as to the contract testified to certain admissions of the deceased, thus:

"By the Court: Now tell me the first thing he said. Don't go and bunch it together, but tell what he

said and what you said.  A.  He asked me if I would go up to where John Mast lived and tell them to come down; that he wanted to see them.

"By the Court:  Well, is that all?  A.  Yes, sir.  . . .

"Q.  Now, you may state to the court whether or not, after going up to inform John Mast that Bohannan wanted to see him, as you have just narrated, you had a conversation with Tilman C. Bohannan about these girls, Myrtie Mast and Martha Walker, had happened to come there?  A.  How is that?

"Q.  If you had any conversation with Bohannan, after these people had moved back there the second time—after the Mast people had moved there the second time—if you had any conversation with Bohannan as to how they had happened to move back, and what he had told these girls, if anything, with reference to his land?  A.  Why, yes, I happened along there in a few days after Mr. Mast's folks was down to see him, and I don't know but what I asked him if they was going to come back, and he says: 'Yes. I told the girls if they would come and stay with me as long as I lived, why, this place would be theirs.'

"By the Court:  Go ahead; what place did he refer to?  A.  Why, the one that he was living on, I suppose.

"By Mr. Blagg, Counsel for Defendant:  I object to what he supposed, your honor.

"By the Court:  Yes.  Did he have any other place?  A.  Not that I know of.

"By the Court:  That is the simple way to get at it.  Go on.

"Q.  Did you have any other conversation with him at any time with reference to this matter?  A. No, sir; I don't know as I did."

On further examination the witnesses reiterated the statement in this language:

"By the Court:    Never mind supposing.    Be careful and concentrate your mind on exactly what he said, and tell it as near as you can. A. He told me that he told the girls, if they would come down there and stay with him as long as he lived, the place would be theirs when he was through with it."

Jim French testified:

"Q. State to the court whether or not you had any conversation with him in regard to his giving his property to Martha Walker and Myrtie Mast, the plaintiffs in this case? A. I did.

"Q. What was that conversation, as near as you can remember? A. It wasn't but a short time before he died. I wouldn't say just what time, but I think it was in October, a year ago. A year ago last October, I think it was. It was while I was gathering corn, anyhow. He—he—had a gathering down there, and I went down there, with my wife and family, and we were all sitting in the parlor, and Uncle Tilman was sitting out by the heating stove. It was a little cool, and he was sitting out by the heating stove, in the sitting room, and I went and set down by the side of him and commenced to talk to him, and the subject came up, and we were talking about some life insurance. He said he didn't have very much to leave anybody, and that he had told the girls, if they would stay with him as long as he lived that what he had left should be theirs.

"Q. How did you happen to tax your mind with this? A. With this?

"Q. Yes. A. Well, this part of it is—that is, would be more apt to come up, because he asked me— I asked him if he had made a will with regard to this, and he said he hadn't.

"Q. He said he hadn't? A. He said that he hadn't.

"Q. All right. Go ahead. A. I asked him why he didn't make a will, and he said he didn't want to

make any will, because he said he was blind and couldn't see. I said that didn't make any difference. Then he cited me to Uncle Tice Smock. He said he willed away all he had, and now he had nothing; and he wanted to keep his home as long as he lived. Now —then the other people came in from the other room and that is—the last part is all I remember anything about.''

Robert Campbell testified:

''Q. State to the court whether or not you had any conversation with him relative to his giving his property to Myrtie Mast and Martha Walker? A. Well, yes. I was going to Skidmore one day.''

''By the court: Well, when was it?''

''Q. About when? A. About two years ago, I think. I was going up to Skidmore, and stopped in there to get a drink, and he was setting out in the shade of the house there, and we set down and talked, and he just commenced and told me about what he was going to do with those girls there. He said that the girls—he told the girls if they would stay with him as long as they lived, and take care of him, what he had was theirs at his death. Now that was about the amount of his conversation in regard to that. . . .

''By the court: Repeat what he said, again, about the girls. A. Why, he said he told the girls, if they would stay with him as long as he lived and took care of him, what property he had there he intended for them. . . .

''Q. Old Mr. Bohannan was a very communicative fellow about his affairs? A. He seemed to be. Yes.

''Q. Nearly everybody that came along, he told about his property, didn't he? A. I don't think he did.

''Q. He told you, and Hughes, and French, didn't he? A. Yes, he told me, I know that much.

"Q. Told you all about what he intended to do? A. No. He never told me all about what he intended to do. He told me he intended for them girls to have what he had, if they took care of him."

Thomas Marlin testified:

"Q. State to the court if you had any conversation with him in regard to Myrtie Mast and Martha Walker caring for him, and what they were to receive for it, if anything?

"By the court: And when was it, and where was it?

"Q. And when was it? A. Well, I couldn't tell you the exact date.

"Q. About when? A. It was somewhere about two years before he died. I was coming by there one day—coming by there. I had been somewhere below. And he was out, setting out in the shade, in the yard.

"Q. There at his place? A. At the place, where he lived. And I never got in hearing distance of him but what I spoke to him, and he always knew everybody he was acquainted with by their voice. And he was setting out in the yard, and I hollowed at him, and drove up to the rack there, and he says: 'Get a drink of water.' And I did so. He went to the well, and went to pumping some water, and I went out there and got a drink, and then we come around and set down in the shade of the house and talked quite a little bit about old times. Well, he made his home at our house for three or four years, off and on, years ago. And it was probably four or five months after John and the girls had moved back down there—after John and the girls moved back. It was after Martha came back down there. I think she came back there in July, if I ain't mistaken about the time. And it was a while after she had come back there. And I asked him if the girls were still going to stay and take care of him, and he said that was the calculation. And he

says: 'I told them, if they would stay here and take care of me while I lived, that they would have what was left of what I had when I passed out.'

"Q. That is all. Take the witness." (Witness, continuing): "Well, says I to him then, says I: 'You ought to fix it so it will go where you want it to go, when you are gone. If you don't why it will be to fix afterwards.'

"Q. What did he say to that? A. Well, he says: 'How would you fix it?' 'Well,' says I, 'if I was going to fix it, I would fix it with a deed. I would deed it to whoever I wanted to have it, and file it with somebody to hold until you are gone, and that will end it. That is my idea about it.' Says I: 'If you don't, it will get into litigation after you are gone.' And he said that looked reasonable and right, and he thought he would; but that was the last of it. That is the last I talked to him about it, and that was probably two years before he died."

C. C. Hendrix testified:

"Q. Did you have any conversation with him in regard to the plaintiffs, Myrtie Mast and Martha Walker, taking care of him and what compensation they were to receive for it?

"By the court: When and where?

"Q. If so, when and where? A. He spoke one time to me about two years ago. Two years ago in July or August, I think, I lived at that time on the place Mr. Hughes now lives on. We were neighbors. I went there to see Mr. Mast, and he wasn't at home, and of course I fell into conversation with Mr. Bohannan. We had always been well acquainted. I asked him if he wasn't lonesome, and if he didn't get lonesome; and he said: 'Yes, very much so, some times.' The folks were away from home that day, I think. I don't know just where they was. But he finally spoke something about his affairs. He said sometimes he had a notion to sell out and move to

town; but he said he has promised those girls, if they would stay there and take care of him until he was through with what he had, that they would have the remainder of what he had left. That was about all the conversation we had about it. I didn't ask him any questions, and I didn't ask him for that at all.''

W. A. Hughes testified:

''Q. Do you remember of having any conversation with him in regard to this land and as to— A. Well, sir, now and then I was with him, and he would up and tell it.

''Q. Now, what would he say to you? A. What I told you was just about what he said to me. Well I told you that he told me that, if the girls would stay with him as long as he lived, why, what he had, why, it would be theirs.

''Q. That is all. A. What he had left.''

Edward Hughes testified:

''Q. What conversation did you have with him? What did he say and what did you say? A. Well, sir, about all that I recollect of him saying was that he told the girls, if they would stay with him until he died, what he had should be theirs.

''Q. Anything further? A. That is about all. . . .

''Q. Are you married or single? A. Single.

''Q. You are acquainted with Miss Myrtie, are you? A. Yes, sir.

''Q. Uh huh. And he said, now, to you, and all that he said— What is your name? A. Ed Hughes.

''Q. How? A. Ed Hughes.

''Q. He says, 'Ed, I told the girls if they would come and live with me, and take care of me, when I die, they might have all I had left? Is that it? A. He told me that he told the girls, if they would come and take care of him, they could have what he had left.

''Q. Is that all? A. Yes, sir.

"Q. That is all he said? A. That is about all he said.

"Q. If he said anything else, tell it. A. That is about all he said."

Mrs. W. A. Hughes testified:

"Q. Did you have any conversation with Tillman Bohannan in regard to how these girls, Myrtie and Martha, happened to be there and what he was going to do, with his land, with reference to them? A. Well, I'll just tell you: He was down to my place—

"Q. When? A. This last fall, was a year ago—and he was talking about Myrtie going to school and he says: 'I told the girls, if they would—Martha and Myrtie—if they would stay there and take care of me while I lived, this place should be theirs.'

"Q. What place did he refer to? A. Why, the forty he lived on.

"Q. Was there anyone else present? A. My daughter was there. It was in my own house.

"Q. What daughter, what is her first name? A. Mary. All the one I have got."

Mary Hughes testified:

"Q. Have any conversation with him or hear any conversation, in which anything was said about Martha Walker and Myrtie Mast was to have his property? A. Yes, sir.

"Q. What was those conversations? What did he say? What did Tillman Bohannan say? A. Well, he told me that he told Martha and Myrtie, if they would stay with him as long as he lived, that what he had was theirs, when he was done with it.

"Q. Anything further, did he say, on that subject, that you remember of? A. Not that I remember of."

Henry W. Barrett testified:

"Q. Do you remember the occasion of John Mast and his daughters, Myrtie and Martha Walker, when

they moved back to the Bohannan place the last time?
A. Yes, sir.

"Q. Now, with reference to that occasion, you
may state to the court whether or not at any time you
had any conversation with Tillman Bohannan with re-
spect to his giving his property to the plaintiffs in
this case. A. Well, the first time that I ever heard
Mr. Bohannan say anything about it was in the latter
part of the year 1901. It was soon after that Martha
—the oldest girl—her husband died. I was talking
with Mr. Bohannan about it, and I told him in these
words: I says: 'It seems as though Martha is left
in kind of a destitute condition.' 'Well,' Uncle Till-
man says: 'It ain't as bad as it could be.' He says·
'She has always got a home here as long as she wants
to stay and,' he says, 'as long as I live; and,' he says,
'when I die, I know it is my desire,' he says, 'my will,
that the girls shall have this place.' Then along in
June, 1903, I was plowing corn just across the road
from Mr. Bohannan's place; and along about two
o'clock in the afternoon I went across there to get a
drink of water, and Uncle Tillman was standing out
in front of the house, making a wire hook. I suppose
that is what it was.

"By the Court: When was that? A. That was
in June, 1903. And I stood there and watched him
quite a while, and directly I spoke to him: 'What
are you doing there, Uncle Tillman?' 'Well,' he says,
'Harry, I am making a wire hook for the garden gate.'
Directly he says: 'Harry, you don't see how I done
that do you?' I says, 'No, I don't, Uncle Tillman.'
'Well,' he says, 'neither do I.' Well, of course that
kind o' roused the laugh between me and him; and
then he asked me to come in and take a drink of water
and visit awhile with him; which I always did, when I
was over there. I got a drink of water, and sat down
on the east porch there; and one thing brought on
another, and Uncle Tillman went ahead and told me

of his history from the time that he lost his eyesight up until this time.   And he says: 'I, of course,' he says, 'when my last wife died,' he says, 'I was without a home; but,' he says, 'Mr. Mast's folks,' he says, 'I write them or sent word to them that, if they would come back here and take care of me, when I died this farm should go to his wife, Adeline.'   Her first name was Adeline.

"By Mr. Blagg, Counsel for Defendants:   I object to that and ask that that be stricken out as incompetent and immaterial.

"By the Court:   No.   Objection overruled.

"By Mr. Blagg, Counsel for Defendants:   We accept."

"Q.   Go ahead and repeat all the conversation. He told me, he says: 'Of course, when Adeline died I made the same proposition to the girls—that, if they would stay and take care of me, and furnish me a home, that when I die, this place would go to the girls.'   'Well,' I says, 'Uncle Tillman,' says, 'if that is your opinion,' I says, 'don't you know and don't you believe it is your duty to put that down in black and white—on paper in some form, so that there will be no doubt about it?'   'Well,' he says, 'I have always had the belief that I would be warned in plenty of time to make all things straight before I leave this world.' That is all I ever heard the man say in regard to it.''

Without objection the defendants, who were the other relatives of the deceased, were permitted to prove several conversations with Bohannan in which he said that he was going to let the law divide his property after he was through with it; that he was not going to make a will or deed; that he knew how he got his property and was going to keep it, and other statements of this general character.

The evidence discloses no special feeling for the plaintiffs, although it is shown that he said they treated him well.   It was shown that they did the usual work

that women do about a farm and that deceased helped as far as he could. Deceased was on friendly terms with all his relatives so far as the evidence indicates. It should be noted that the evidence fails to disclose whether the talk of Bohannan with John Mast was communicated to the daughters. The daughter Martha did not come back to Bohannan's until July following, because she had to close up her matters on the farm rented by her deceased husband.

The conversations proven by the several witnesses ran through the years from 1901 up to the death of Mr. Bohannan.

The above states the case as strongly for the plaintiffs as the record before us warrants.

I. The enforcement of contracts of the character here involved is an exception which courts of equity have engrafted upon the Statute of Frauds. The exception is one that is sparingly exercised, and rightfully so. Title to real estate should not slumber in oral contracts to convey.

The very conscience of the court must be touched by the facts of the particular case before the exception to the statute will be called into play. The Statute of Frauds had its origin in the dangers which developed in permitting the title to real estate and contracts as to other weighty matters to rest in parol. Courts weighing evidence by the usual rules were constantly enforcing contracts, which were thought to have been proven by false and perjured testimony. The statutes were not only a boon to property interests, but to the courts as well. Not only so, but it removed from society the temptation to acquire property and property rights through fraud and perjury.

With the acquired experience the courts had gained before the passage of the original statutes of frauds and perjuries, they were slow to engraft thereon any exception to the iron-clad rule of the statute.

Later, however, it became apparent to courts of conscience that frauds were being perpetrated under the strict letter of the statute.

To obviate these frauds the exceptions to the statute here invoked was adopted by courts of equity, but not without well defined rules of procedure—rules, which like the statute itself, would be a safeguard as against the perpetration of frauds.

The rules cover many phases; i. e.: (1) The alleged oral contract must be clear, explicit and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged, was in fact made and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) the work constituting performance must be such as is referable solely to the contract sought to be enforced, and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration, so that its performance upon the one hand but not upon the other would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; and (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed, made before the acts of performance relied upon were had.

There may be other phases of the rule adhered to by the courts in cases of this character, but the foregoing are clearly within a long line of Missouri cases. The more recent ones are: Forrister v. Sullivan, 231 Mo. 345; Collins v. Harrell, 219 Mo. 279; Wales v.

Holden, 209 Mo. 552; Kirk v. Middlebrook, 201 Mo. 245. Other cases of like tenor are found cited and discussed in the foregoing. Suffice it to say that they all indicate that the courts are slow to enforce contracts of the character we have here.

It is only where the very justice of the thing is so clear, that the refusal of relief would itself amount to a deep seated wrong and fraud upon the party, that courts of equity will act, and as said before this is right. The fickleness of land titles should be averted. The wholesale enforcement of such contracts would bring more absolute wrongs, than the absolute denial of relief in all such cases. It should therefore be with discerning eye and ear that the chancellor appealed to, should proceed. The single purpose should be the prevention of a real fraud, rather than an imaginary one. His decree should protect substance, rather than shadow, and the evidence to support his decree should point to a real and actual fraud as the outgrowth of a failure to enforce a clear, certain, reasonable and specific contract. By this we mean a contract between the parties, not a contract made for the parties by loose declarations gathered together after death has sealed the lips.

Measured by these rules the plaintiffs' case must fail, as we shall undertake to show.

II. Under the rules, the contract pleaded must be the contract proven. A case of this kind does not differ from other suits upon contracts. In all suits upon contracts, if the plaintiff fail to prove the contract pleaded, his suit must fail, however equitable and just may be the contract actually proven. It is the old rule that the proof must conform to the pleading. The contract relied upon in this case is ''that if they [plaintiffs] would move on his [deceased's] said farm, together with their father, and permit him to reside in their family and render him [deceased] such

care and services in sickness and in health as were necessary, he being blind, until his death, he. would give said plaintiffs all his property.'' With the foregoing as the contract, let us, as with a yard stick, measure the evidence.

The evidence of John Mast must be held of little value, because it is not shown that whatever the deceased said to him prior to the actual removal of the Masts from the daughter's home to the home of deceased was ever communicated to either of the girls. His testimony at most only shows that at the time of the conversation, there was a willingness upon the part of the deceased to enter into such a contract, but it falls far short of showing that the contract was entered into. The young girl was at the home of deceased at the time of this alleged talk, but nothing to show that she was in position to hear the conversation, further than the fact she was in another room of the house at the time.

Passing next to the witness John Hughes, who says that the old gentleman afterward said to him, ''I told the girls if they would come and stay with me as long as I lived, why, this place would be theirs.'' If this admission shows a contract at all, it shows that he had agreed to give them the farm, if they came and stayed with him, but such is not the contract pleaded. The contract pleaded is ''he would give said plaintiffs all his property.'' The contract pleaded covers all property personal, mixed and real. The contract proven by this witness is as to the farm only. Under the rule which requires the specific contract pleaded to be proven the evidence of this witness availeth nothing. If I charge that B. agreed to transfer to me a team, ten cattle and a farm, for ten thousand dollars, such contract is not proven by showing that I had a contract by which he was to transfer me a farm for ten thousand dollars. Suppose the two contracts above suggested were both in writing, and

I should bring suit upon the former, would it be sustained upon the introduction in evidence of the latter? We think not. There would be a variance between the contract pleaded and the contract proven, or the contract introduced in evidence. It is just this particularity that the courts had in mind, when in cases like this they said that the contract proven must be the contract pleaded.

Jim French says the old gentleman said: "If they would stay with him as long as he lived that what he had *left* should be theirs." This does not sustain the contract pleaded. That contract was that he would give them "all his property," and this must be referred to the date of the making of the contract. In other words if he made a contract to give them "all his property" if they would come and stay with him, this means all the property he then had or might thereafter acquire, whilst the admission shown by the witness French is that what was left of his property at his death should go to plaintiffs. In the one instance the old gentleman could not in good conscience dispose of his property because it was all pledged at the making of the contract, whilst on the contract proven his disposition of the property was not hampered, but if any thing was left thereof it belonged to plaintiffs at his death.

Robert Campbell is still more indefinite. The old man told him that he had told the girls "what property he had there he intended for them." This but expresses an intention to convey by devise or deed, but does not show a contract to do either.

So too with Thos. Marlin's testimony. According to this witness the old gentleman said "that they (plaintiffs) would have what was left of what I had when I passed out." When the witness suggested that it should be done by deed, the old man said that looked reasonable. But be that as it may, this evidence does not establish the contract pleaded.

The testimony of W. A. Hughes was to like effect.

We could thus go through the evidence of each and every witness, but as we have set it out in full we shall not go further. To our mind there is a variance between the contract alleged and the several contracts proven.

III.   There is yet another view of this case. Beyond controversy it is shown that the old gentlemen had contracted with the father of the plaintiffs. That under such contract their father was to have the use of the farm and in return therefor was to pay Bohannan fifty dollars per year in cash, and board him. This contract to board him was made in the light of the fact that he was blind. He had boarded him before, and knew full well the obligation he was assuming under the contract. One of the girls was scarcely fourteen years old, and the other a widow without a home. The whole evidence shows that they did nothing about the place which is not referable to their relations with the father. The younger girl went off to school. In fact every act which they did is as reasonably referable to the contract of the father and their relations to him (an invalid himself) as to the alleged contract in suit. In such case the law precludes a specific performance in cases of the character here involved. In such case there is no such undue advantage gained under the alleged contract as will demand its enforcement to the end that a fraud would be prevented. We shall not go further. In view of the very recent holdings of this court in the cases cited supra, the plaintiffs failed to advance proof measuring up to the strict legal standard.

This standard should not be lowered. Real cases of specific performance of contracts of this kind have been few and far between, and justly so. Title to real estate should remain just where the death of the owner left it, unless the conduct of the owner has

been such as to severely prick the conscience of the chancellor. When death has sealed the lips of the one who knows the facts, vague, loose and indefinite proven statements, or alleged statement, should not change the course of property descent.

The judgment below was for the right parties, and it is affirmed. All concur, except *Valliant, J.*, absent.