LYDIA COSTELLO, Appellant, v. ROY J. MOORE and MARY MOORE.—No. 40451.—211 S. W. (2d) 921.

Division Two, May 27, 1948.

Rehearing Denied, June 14, 1948.

*Harry Gershenson* for appellant.

*Herbert E. Bryant* for respondents.

[922] LEEDY, J.—This is an appeal from a decree of the Circuit Court of St. Louis County where appellant was plaintiff, and respondents were defendants. They will be so referred to in this opinion.

On April 25, 1945, plaintiff conveyed her residence property in Pine Lawn, St. Louis County, to the defendants Roy J. Moore and Mary M. Moore, his wife, by general warranty deed. The husband, Roy, is plaintiff's nephew. Following the execution and delivery of the deed, the Moores moved into the property with their family of

three children, and plaintiff thereafter lived with them, paying $20.00 a month board. Sometime later friction developed, and on August 20, 1946, plaintiff filed this suit, the crux of which is indicated by these allegations of her petition: "Plaintiff further states that on or about the last named date [April 25, 1945], plaintiff and defendants did agree that title to the property above described was to be conveyed by plaintiff to defendants upon condition and in consideration of the agreement between the parties that plaintiff was to have the right to live in the said property in the same manner in which she had theretofore lived therein for the rest of her natural life; that plaintiff was to have a life estate in and to the said real property; that plaintiff was to receive from defendants the sum of Two Thousand Dollars ($2000.00) in cash and a promissory note for Fifteen Hundred Dollars ($1,500.00) in addition to the foregoing agreements; that plaintiff was to pay defendants for board the sum of Twenty Dollars ($20.00) per month; that plaintiff's furniture and effects were to remain in the said property so long as she lived; that pursuant to such agreements and the payment of said sum and execution of said promissory note such conveyance was accordingly made." Her prayer was that she be adjudged and decreed "entitled to a life estate in the foregoing property, subject only to the payment of $20.00 a month for her board to defendants," or, in the alternative, that the deed be cancelled and set aside, and title be re-invested in her, and for general relief.

Defendant's answer, on the crucial question mentioned, denied that the title to the property was to be conveyed on any condition or consideration that plaintiff was to have the right to live in said property for her life, or that she was to have a life estate therein. The answer alleged that "the only agreement between the parties was that the property was to be conveyed from plaintiff to defendants by a general warranty deed, and that said deed was duly executed on April 25, 1945, conveying the fee simple title to said property from plaintiff to defendants herein," and that the same was duly recorded the same day.

The trial court found for defendants, and entered its decree accordingly, from which plaintiff prosecutes this appeal. The petition does not, in terms, ask for reformation of the instrument, nor does it contain allegations appropriate, if not indispensable, to invoke that relief. The case was tried below, and it has been briefed here, as one for the specific performance of an oral agreement for a life estate in the property, which, it is contended, is not within the statute of frauds because fully performed by plaintiff, and partially performed by defendants. Assuming, without deciding, the correctness of this theory, and, for the sake of brevity, ignoring the propositions of law invoked by defendants, we pass directly to the question of the proof of the agreement.

The property in question consists of two 30-foot lots having a depth of 152 or 158 feet on which there is a dwelling, four rooms and bath, frame, covered with shingles. It was acquired during the lifetime of plaintiff's husband. Formerly there were four lots. The dwelling is located on the two middle lots, those covered by the deed now in question. Plaintiff still owns the abutting lot on the north, as well as the [923] one abutting on the south. Plaintiff has been a widow since 1933, and was 63 years of age at the time of trial. Roy Moore is a railroad fireman.

Negotiations looking to the transfer were commenced during the Christmas holidays in 1944,—apparently at a family gathering—at which time, according to plaintiff's testimony, Mary Moore asked her if she was still going to sell her house. "She mentioned it would be nice if they could buy it, and I could live with them, and she said I would have a place to live for the rest of my life, if we could agree on that."

The first proposal appears to have embraced three lots (the two middle ones, and the one on the north)—at a figure of $4500.00, i. e., $3000.00 cash and a note for $1500.00. The Moores were unable to finance at this figure, so the third lot was omitted, and the figure reduced to $3500.00, involving a cash payment of $2000.00 instead of $3000.00. Whether these figures represent the entire consideration for the deed is the single disputed question of fact. Only four witnesses testified in the case, the plaintiff and another in her behalf, and the two defendants in their own behalf. Plaintiff testified there were several conversations between them respecting the proposed transfer. We excerpt the most favorable portions of plaintiff's testimony on the vital question of the terms of the agreement: "I was told first they wanted to buy all three lots and the house, which I wanted $3,000.00 for in cash, and the rest I was going to take up in a note for $1,500.00 without interest. We were all very pleased at the time about the agreement. . . . They said if I conveyed the property over, they would be good to me and I would have a home for the rest of my life."

"Q. How much were you supposed to pay them, if anything, for board? A. I was supposed to pay them $20.00 a month for my board. . .

Q. What did you say, and what did they say to you about what they were going to do? A. They just said I would live there the rest of my life and they would be good to me and take care of me. And I said suppose something unforeseen would happen and I would have to use this $2,000.00 in cash, when I got older, what then? And they said they would take care of me when I didn't have any more money and that was the agreement.

Q. At the time you made the conveyance to the Moores, did you discuss this life estate? A. Yes.

Q. I mean at the time you actually signed the papers. A. Sure, that was the agreement, I would have sold otherwise. I wanted to live there the rest of my life. . . .

Q. At the time papers were signed, where was that done? A. At the Kuhs Real Estate . . . on North Grand.

Q. Did you have a discussion there with the defendants? A. Yes.

Q. What was said? A. I asked about the agreement, about the money being turned over to them, the $20.00 a month, and I asked Mr. Kuhs how to do that with the note, and he said just to sign on the back of the note that $20.00 and it would be deducted, and that was all right that way. I even discussed how happy I was about living there, that I was still going to live in my home and be taken care of; and Mr. Kuhs even said that was a nice agreement.

Q. Did anybody say anything about it being put in the paper, or not being put in the paper? A. No, no one said that. . . .

## CROSS EXAMINATION.

Q. And I believe you told me that you fixed the price at $3500.00? A. The first price was $4500.00.

Q. $4500.00? A. Yes, that was for the three lots, that's what I paid for them, the three lots and the house.

Q. Then I believe they had the property appraised, is that correct, to get the loan? A. Yes, they tried to get the three lots and the house.

Q. And after that the price was fixed for the two lots and the house? A. Well, I told them, I gave them the price—

Q. That was $3500.00? A. They said they wanted the other lot later on and I said I would keep that for them.

[924] Q. But you actually conveyed for $3500.00? A. Yes.

Q. And that was the price you fixed? A. Yes.''

In substance the testimony of plaintiff's other witness, Mrs. Alice Gordon Nelson, (with whom plaintiff was then living), was this: That on the day the deed was made, and at the funeral of plaintiff's brother-in-law, as witness "left the casket," plaintiff said, "I sold my property," to which witness replied, "My God, who did you sell it to?" "And she said, 'To Roy and Mary,' and I said 'Oh,' and Mary was sitting right there in the pew, and she said 'Oh, yes, we bought it and Aunt Lydia is going to stay with us the rest of her life, just like she was at her home, and we will take care of her, she will be just exactly as she always was.' . . . And I said, 'I hope you do, Mary, take care of her.' '' Defendant Roy Moore was not present.

Defendants were quite positive in their testimony that there was nothing said about, nor any agreement that, plaintiff should retain a life estate or any other interest in the property. Both admitted, however, that "as a part of the deal" they expected plaintiff to live

with them in the home, and to pay them board. They were emphatic that she was welcome so to do as long as she desired, and they so advised plaintiff. Board at $20.00 a month was agreed on (later, as we understand), and this was paid until August, 1946, a period of sixteen months, by monthly credits endorsed upon the Moores' $1500.00 note. Friction arose about this time, the details of which are not deemed sufficiently important to set out. It is enough to say that when plaintiff claimed she had a life estate in the property, or could stay therein for the rest of her life, as a matter of right, their friendly relations deteriorated rapidly, and culminated in the filing of this suit. About a year after the conveyance was made, the Moores became dissatisfied as to the amount to be paid for plaintiff's board, and this element also entered into their differences. Mrs. Moore's recollection of the conversation with Mrs. Nelson was that she did tell her that they "had bought her [plaintiff's] home, and that she was going to live with us."

The proof leaves much to be desired in the way of a convincing showing. First and foremost, there was no semblance of an explanation of, or excuse for, the failure to express in the warranty deed the reservation of a life estate in plaintiff, as the grantor, if there was, in fact, any such understanding. Although there was an apparently disinterested witness (the real estate agent who closed the deal, and who was quoted by plaintiff as having knowledge of the terms of the agreement), he was, nevertheless, not called to the stand. It does not appear who drew the papers. Moreover, there was no competent proof of the market value of the property, except, perhaps, by remote inference. Even so, there was still no showing of any real disparity between that value and the purchase price. Plaintiff's testimony as to the conversations respecting the agreement appears to represent her conclusions as to their effect, rather than the statement of the substance of those conversations.

Two of the prime requisites of the proof in cases of the character we are treating this one to be are: (1) That it must leave no reasonable doubt in the mind of the chancellor that the particular contract as alleged was made, and; (2) That its terms be clear and definite. Walker v. Bohannan, 243 Mo. 119, 147 S. W. 1024.

The witnesses appeared in open court. Their testimony was conflicting. They were observed by the trial judge, whose opportunity to judge their credibility was superior to ours. We would not be justified in upsetting his finding, made on conflicting evidence, in the absence of a showing that it was against the weight of the evidence. Manifestly this does not appear, and so the decree should be, and it is, affirmed. All concur.

978,

STATE v. JERENE STRINGER, Appellant.—No. 40747.—211 S. W. (2d) 925.

Division Two, May 27, 1948.

Rehearing Denied, June 14, 1948.

*Samuel Richeson* for appellant.

*J. E. Taylor*, Attorney General, and *Harry H. Kay*, Assistant Attorney General, for respondent.

[926] BARRETT, C.—On Thursday, the 15th of August 1946, at eleven o'clock in the morning, the appellant, with the attendance of a doctor, gave birth to a normal, nine months male child. The appellant was twenty-three years old, a single girl, employed in a shoe factory. She lived with her sister in a one-room building on the banks of Britton Creek in Potosi. She had made no preparation whatever for the baby's birth and the doctor's daughter, who was a nurse and assisted her father in the accouchement, brought clothes for the baby. As they were leaving the daughter stated that she would leave the baby clothes but the appellant said that she would not need them. When the doctor asked for the baby's name she answered that it had no name and requested that he say nothing about the baby's birth. A little girl in the neighborhood discovered that there was a baby in the building and about 2 o'clock walked in and asked to see it. The appellant told her that the baby was no longer there, that she had given it to some friends in St. Louis. On the following Saturday the doctor and his daughter again called on the appellant and she told them that she had given the baby to some people in St. Louis. In the afternoon the sheriff and the prosecuting attorney called and inquired about the baby. She informed them that she had given it to some friends of the nurse's in St. Louis. The sheriff did not believe her and insisted that she tell him the truth. She then told the sheriff and the prosecuting attorney that she tired of her position in the bed and wanted to move, that the baby had been lying between her and the wall, and when she picked it up to move over she accidentally dropped it on its face on the floor and it died. She said: "I was so scared I didn't know what to do." So, within two hours of its birth, she took the baby out back of the house and hid it in the weeds. Neighbors made a search along the creek bank

and found the bones of a newly born baby. The inference is that dogs had devoured the child.