Margaret Weidman Jones **ROOKSTOOL,**
Appellant,

v.

**Joseph NEAF, Administrator of the Estate of Fred Weidman, Deceased, and Marian Frances Long, Respondents.**

No. 50092.

Supreme Court of Missouri,

Division No. 2.

April 13, 1964.

James C. Moloney, St. Louis, for plaintiff-appellant.

George E. Murray and Frank C. Boland, Clayton, for defendants-respondents.

PRITCHARD, Commissioner.

Plaintiff, as the former spouse of decedent, Fred Weidman, sought specific performance of an alleged oral contract, made just prior to their 1952 divorce, that each of them would keep their existing mutual and reciprocal last wills and testaments in force and not revoke them. Decedent and the plaintiff did not personally revoke their

wills, but § 474.420 (all statutory references are to RSMo 1959, V.A.M.S.) below set forth, in terms revokes provisions in a will executed prior to the divorce for a divorced spouse. From an adverse judgment of the trial court, plaintiff appeals. The issues concern whether plaintiff has shown sufficient part performance upon her part to remove her alleged parol agreement from the operation of the statute of frauds, § 432.010, and the application of said revocation statute to the facts of this case.

■ The estate of decedent consists of real estate inventoried and appraised at $53,500, and some personal property carried by the public administrator on his January 8, 1962, settlement at $3,110.50. We have jurisdiction of this appeal by reason of title to real estate being involved between the plaintiff, as promisee under said alleged oral contract, and the defendant, Marian Frances Long, as sole heir of decedent. Mo.Const. Art. V, § 3, V.A.M.S.

Plaintiff relies upon her alleged oral contract to circumvent the provisions of § 474.420, which read:

"If after making a will the testator is divorced, all provisions in the will in favor of the testator's spouse so divorced are thereby revoked but the effect of the revocation shall be the same as if the divorced spouse had died at the time of the divorce. With this exception, no written will, nor any part thereof, can be revoked by any change in the circumstances or condition of the testator."

The evidence which was adduced by plaintiff, the defendants having introduced none but having stood upon their motion for judgment at the close of plaintiff's case, is as follows: Plaintiff and decedent were married in St. Louis, Missouri, on February 23, 1934. On March 3, 1938, they each executed their last wills and testaments by which they each left all of their property to the other. Both of these wills remained unrevoked by the parties until de-

cedent's death which occurred on June 14, 1957 (after the January 1, 1956 effective date of § 474.420). On July 5, 1957, decedent's will was duly admitted to probate in the Probate Court of St. Louis County, Missouri. Neither of the wills of plaintiff and decedent makes a reference to any contract nor to the other will, but both merely leave all property, real, personal and mixed, wherever the same may be situated, and which each might own at the time of death, absolutely and unconditionally to the other spouse. Each spouse is reciprocally named executor and executrix of the wills, and the attesting witnesses are the same on each.

On March 28, 1952, at plaintiff's instance there was a divorce suit pending between plaintiff and decedent, in which he had filed a cross-petition for divorce. On that date they entered into a written property settlement agreement which was signed by each of them and their respective counsel in the suit. Under this written agreement plaintiff was paid $12,000 and in turn by deed she released her interest in certain real estate which had been owned by the parties as tenants by the entirety. It was stipulated in the agreement that "[I]t is contracted and agreed that upon the execution of this agreement (or upon the conveyance of the real property and payment of the $12,000 as alimony in gross) * * * [it] shall constitute the full and complete payment and settlement of any and all claims which they have against each other arising out of their marriage, including all claims for dower and other statutory allowances of every kind and description." Decedent later withdrew his cross-petition for divorce and on April 18, 1952, plaintiff was granted a decree of divorce upon her petition. Thereafter, on or about October 22, 1953, plaintiff was married to one Eugene Dunnigan from whom she was later divorced.

Luther B. Jones, plaintiff's father, testified in her behalf. He and his wife, plaintiff's mother, lived with plaintiff and decedent up to the time of their divorce. Mr. Jones was present when decedent and plain-

tiff had a conversation regarding the divorce settlement the day before the decree of divorce was granted. Plaintiff then said that she was dissatisfied with the amount of the settlement she was getting. She said she had sold her grocery store and meat market on Woodson Road and mortgaged her home for $6,000 to go into the tavern (on Woodson Road near Page Avenue, which tavern was owned by decedent at the time of his death). According to plaintiff the settlement was not enough compensation for her to accept and to live; she was losing too much money. Decedent then said, "Well, Margaret, I know it's worth more. I know you should get more, but, I borrowed all the money that I can borrow and the only way I can get up any more is to sell the place. I don't want to do that." Both plaintiff and decedent then agreed that they did not want to sell the tavern to raise any more money, and that each of them would leave a will—she had a will made to decedent and he had a will made to her, and each agreed not to change the wills, but to let them stand "as. is" so that they might some day · one or the other get the property. After the divorce and on the same day thereof decedent handed Mr. Jones both wills and asked him to take care of them. Mr. Jones then put the wills on the dresser and one or two days thereafter he put them in the bank with his other valuable papers, where the wills remained until decedent's death. He then gave both wills to the plaintiff. Decedent never did ask Mr. Jones to return the wills to him. The day before decedent died Mr. Jones saw him in the hospital. At that time, decedent said to him, "I want you to take care of those wills. * * * You know that Marge and I had agreed to that neither one of us would change the will and we'd keep the property intact in case of either one's death." Mr. Jones testified further that decedent knew that after her divorce from him plaintiff married Gene Dunnigan, whom decedent knew, and that they had a divorce. Decedent also knew of plaintiff's prior marriage to a person by the name of Castein or Cansten and that she divorced

him several months before she married decedent.

Mrs. Thelma Bornefeld, sister of plaintiff, testified that she .had a conversation with decedent in her driveway in the spring of 1956 in which he asked about plaintiff as he always did, and then said further, "Well, I sure wish she would come back. I still love her. That will is never going to be changed. It's going to stand the way it was made out"; and "I'll never change that will."

Mrs. Mary Roberts, another sister of plaintiff, testified that she (being then eighteen years of age) was present when plaintiff and decedent made their wills on March 3, 1938, at which time "they said they wanted that will to stand as was regardless of what happened at any time to either one of them until death because they, they were—felt sure that nothing would ever —." On further direct examination, Mrs. Roberts testified that Fred and Marge (decedent and plaintiff) then said the will would never be changed. It would remain the same. In Mrs. Roberts' presence, plaintiff and decedent had discussions regarding the wills both before and after the divorce. Several days prior to the divorce a discussion took place in the kitchen of the home at 3016 Woodson Road where Mrs. Roberts was also staying. Those present were her father and mother, plaintiff, decedent and Mrs. Roberts. They were discussing getting the divorce and talking about the settlement. Decedent said he didn't think he would be able to get enough money without selling the tavern and plaintiff said she would rather he would not sell it. Decedent then said he did not want to sell, so he said, "Let our wills remain as we stated before—until—until death. We won't change them." Plaintiff agreed to that. After the divorce was had, there was the same type of discussion and decedent gave Mr. Jones the wills to keep and said, "Pop, you keep these wills in case anything would ever happen. You keep them. If anything would ever happen, I want this to stay this way the way we agreed." Mrs. Roberts

saw decedent hand her father the two wills, and her father put them in the bedroom in the chest of drawers. Thereafter, Mrs. Roberts frequently talked to decedent—they were fairly close. In the spring of 1956 decedent came to her house, and he said, among other things concerning his good feelings toward plaintiff, that he wanted the wills to remain the same; and "Now that will will never be changed. That's the way I wanted it." At that time decedent was not well and was talking all the time about going to the doctor. Then the day before decedent died at the hospital, Mrs. Roberts took her father up to see him. At that time decedent remarked that he wanted Mr. Jones to have the money he owed him (Mr. Jones and his wife had filed a claim or claims against decedent's estate for money he allegedly owed them). Decedent said further, "You remember that will? I don't want that will to be changed. I want it to stay as it is. The will is to remain the way it is." Mrs. Roberts testified further that decedent knew about plaintiff's marriage to and divorce from Gene Dunnigan.

William Buddemeyer, a social friend of plaintiff, testified that he had heard decedent discuss his will at the Woodson Road tavern in 1954 on an occasion when plaintiff and her then husband, Dunnigan, were present therein. Decedent then made the statement that he was sorry to see plaintiff get married but "as far as the will when he was still living the will as it was left everything to her if anything ever happened to him." This statement was made when decedent, Cecil Paul, Johnny Shaner and Mr. Buddemeyer were sitting at a table and plaintiff, with her husband, was sitting at the bar. On other occasions, in 1953, decedent came to the tavern and told Mr. Buddemeyer that, "I hope she (plaintiff) gets along all right. I'm still going to leave her this place, everything I got if I was to die. The will is going to stay like it is." Later in 1954, decedent told Mr. Buddemeyer, Shaner and Paul (who frequented the tavern) that he was going to leave

everything to plaintiff. He again discussed his will with Mr. Buddemeyer in 1955.

■ It has been held that an agreement not to revoke a will is, in effect, the same as an agreement to make a will and must be in writing. 49 Am.Jur., Statute of Frauds, § 215, p. 539; West v. Day Trust Co., 328 Mass. 381, 103 N.E.2d 813, 816, 29 A.L.R.2d 1224 quoting from Cazaurang v. Carrey, 117 Cal.App. 511, 4 P.2d 259, 261, where that court gave the reason for the rule: " 'Whether an agreement be to make a will or whether it be not to revoke one already made, the essence of the agreement is to have a will in existence at the time of the death of the promisor which designates the promisee as a beneficiary in accordance with the agreement.' "

"The great weight of authority is to the effect that mutual wills, made by separate instruments, do not afford sufficient evidence that the wills were made pursuant to a contract, and that, hence, if the contract is shown at all, oral evidence is necessary." Canada v. Ihmsen, 33 Wyo. 439, 240 P. 927, 929; 43 A.L.R. 1027; Wanger v. Marr, 257 Mo. 482, 165 S.W. 1027, 1030 [3]. There is no evidence in this case which would tend to show an agreement between plaintiff and decedent to make (and not revoke) their wills at the time they were executed on March 3, 1938. They said merely that the wills would remain the same and would never be changed. The wills themselves do not refer to any contract or to each other, and are therefore no evidence of an agreement made at any time. Thus, plaintiff's case depends entirely upon the parol agreement that the parties would not revoke their existing wills made just prior to her divorce from decedent, and to that agreement defendants have interposed the defense of the statute of frauds, § 432.010. The question now is: Does plaintiff have any performance of her part of the parol agreement which would remove it from the operation of the statute of frauds?

■ We have been cited to no authority in this state, and we have found none, in-

volving the question of whether the mere leaving of a will unrevoked to the time of the death of the other party to the oral contract not to revoke the mutual, reciprocal wills is a sufficient performance to remove such agreement from the operation of our statute of frauds. The evidence shows that both the plaintiff and decedent did not personally revoke their mutual wills, and of course any such revocation occurred by operation of the statute, § 474.420, supra, which has the same effect as if they had voluntarily made a revocation of their wills. The only thing which would save the benefits of these statutorily revoked wills to either the decedent (had he been the survivor) or to the plaintiff is an enforceable contract made between them not to revoke the wills.

■ There is in this case no clear and convincing evidence that at the time of the written property settlement agreement, an incident of the divorce, on March 28, 1952, between plaintiff and decedent, that there was anything which induced her to sign it to her detriment (i. e., that she gave up the right to insist upon more being given to her under the property settlement agreement in reliance upon decedent's promise to leave her all of his property by will). Plaintiff's father testified that the oral discussion took place the day before the divorce, April 18, 1952; and her sister testified that the discussion took place several days before the divorce. Therefore, the mutual promises of plaintiff and decedent stood alone and were not collateral to or a part and parcel of the written property settlement agreement which if so might bring the oral agreement within the rule that "acknowledgments in a written contract may be superseded by oral promises which induce the signing of the contract." 17A C.J.S. Contracts § 323, p. 217. Thus, there can be no valid theory in this case that part performance may be found in an inducement to execute the written property settlement agreement which would estop the defendants from effectively pleading the statute of frauds.

We look now to ascertain if there was any valid performance of the parol agreement by the fact that plaintiff left her will personally unrevoked by her up to the time of decedent's death. Proceeding upon the sound premise above set forth that an agreement not to revoke a will is the same as an agreement to make a will, we find in 49 Am.Jur., Statute of Frauds, § 215, p. 540, the statement, "The rule that an oral agreement to devise land is invalid includes an agreement that each of the parties shall make a will devising land in favor of the other or to a third person." In 49 Am.Jur., Statute of Frauds, § 522, p. 820 (see also the pocket part to this section), it is said, "In case of agreements to make mutual or reciprocal wills, the fact that the plaintiff made a will which was not revoked at the time of the death of the other party has been held by some, although not all, authorities not to be such part performance as to take the promise of the other party out of the operation of the statute." In the there cited case of Canada v. Ihmsen, 33 Wyo. 439, 240 P. 927, 930, also reported and the subject annotated in 43 A.L.R. 1020, the court refused to grant specific performance of an oral contract between two adjoining property owners to devise by will the lot of the one who first died, so that the survivor might have two lots upon which to build, one lot being too small for that purpose. The wills were executed, reciprocally devising the respective properties of each party to the other. Later, deceased made a new will revoking the reciprocal will to plaintiff. The court said, "The only performance that is claimed in the case at bar is the fact that the plaintiff executed the will in pursuance of the contract which he claims was made, and that he left his will in the custody of a third person. A similar situation is disclosed in the case of Gould v. Mansfield, supra (103 Mass. 408, 4 Am. Rep. 573), in which the court said merely: 'There has been no part performance which amounts to anything.' A like situation, too, was disclosed in the case of Hale v. Hale, supra (90 Va. 728, 19 S.E. 739), and the court said: 'The equitable doctrine of

part performance is also invoked; but as to this, we may say, as was said in a similar case in Massachusetts, that "there has been no part performance which amounts to anything." ' " (Parenthetical citation added.) In the Ihmsen case, supra, the case of Gooding v. Brown, 35 Hun (N.Y.) 148, is quoted: " 'Nothing can be regarded as requisite part performance to take such agreement out of the operation of the Statute of Frauds, which does not place the party seeking relief in a situation which is a fraud upon him, unless the execution of the contract be required in his behalf and for his protection. * * * The agreement here was executory; no rights of property could vest until the devise and bequest became effectual by the decease of the party making the will. The fact that the plaintiff executed a will does not establish performance of the contract on his part so as to divest himself of any rights of property, nor did it place him in a situation from which he could not retreat without prejudice to any rights existing at the time the agreement was made. The revocation by Wells Gooding of his will was a mere failure on his part to transfer his property by will to the plaintiff. The latter lost nothing by the agreement or by any part performance of it, he simply failed to acquire by devise the estate of his brother. The element of fraud which equity will recognize in support of the right to execution of a contract within the statute, does not appear in this case.' " See also McClanahan v. McClanahan, et al., 77 Wash. 138, 137 P. 479; De Moss v. Robinson, 46 Mich. 62, 8 N.W. 712, 41 Am.Rep. 144; and 102 A.L.R. 491.

We are not persuaded by the reasoning in Turnipseed v. Sirrine, 57 S.C. 559, 35 S.E. 757, 759, where the facts showed that an aged aunt and her niece made mutual and substantially reciprocal wills pursuant to an oral contract therefor. The niece made a different provision by will and her estate consisted of personal property only. The court granted specific performance of the oral contract to the plaintiff aunt, saying:

"If the plaintiff had died before Mrs. Neblett, she would have received at least as much as $10,000 from the plaintiff's estate. She therefore had the benefit of what might be termed the 'risk' from 1892 until 1897." Nor do we, under our statute of frauds, subscribe to the rule in Brown v. Webster, 90 Neb. 591, 134 N.W. 185, 188, where the court said, "[i]n this case we think there was not only part performance by the plaintiff, but that the performance by her of her part of the agreement was a complete performance. She at once executed the will provided for in her agreement with her husband, and never receded from it, * * *." That case may be distinguished in part by the unique provisions of the Nebraska statute of frauds that the statute must "not be construed to affect in any manner the power of a testator in the disposition of his real estate by a last will and testament, nor to prevent any trust from arising or being extinguished by implication or operation of law" and "Nothing in this chapter contained shall be construed to abridge the powers of the court of chancery to compel the specific performance of agreement in cases of part performance." We note also from the facts in Brown v. Webster, supra, that both before and after the oral agreement for mutual wills that the husband had in his own name taken charge of and failed to account for certain portions of the plaintiff's separate property.

Other cases upon the proposition of enforcement of oral agreements not to revoke mutual wills, where the survivor is claiming part performance by the fact that he left his own will unrevoked up to the time of death of the other party, place the denial of relief upon the ground that the wills being ambulatory in nature, the execution of such an instrument does not in itself change the position of either party. 169 A.L.R. 45. See also, annotation in 29 A.L.R.2d 1233, where the conclusion of the court in the case of Cazaurang v. Carrey, 117 Cal. App. 511, 4 P.2d 259, is set forth, "No performance, full or otherwise, appeared of the subsequent agreement not to revoke the

will already made, stating: 'In no manner has this agreement been executed, and in fact it could hardly be fully executed prior to the death of the party making the will.'"

We rule that there was no part performance in this case from the fact that plaintiff left her will unrevoked up to the time of decedent's death. The rules announced in the Ihmsen case, and cases therein cited, supra, are applicable with force here: "There has been no part performance which amounts to anything." There is no fraud here upon plaintiff from which equity would relieve her. She did not change her position with respect to any of her separate property either at the time of the oral agreement or after her divorce was granted from decedent. She was not placed in a situation from which she could not retreat without prejudice to her rights existing at the time of her oral agreement. Plaintiff and decedent each continued to hold their separate properties after the divorce, and all that plaintiff had was an expectancy that she might take decedent's property under his will. Plaintiff's oral promise from decedent is within our statute of frauds, § 432.010, the purpose of which is to prevent the enforcement of oral contracts such as this. Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, 1028.

We consider now the applicability of the revocation statute, § 474.420, supra. Prior to the enactment of this statute, which became effective January 1, 1956, as a part of our 1955 Probate Code, divorce did not revoke a provision in a will executed prior to the divorce for a divorced spouse. See Robertson v. Jones, 345 Mo. 828, 136 S.W.2d 278. In plaintiff's brief, under Point IV, she recites the provisions of Laws 1955, p. 385, relating to the effective date and governing procedure of the Probate Code, and does not set forth any reason why § 474.420 should not here apply. Such point does not comply with Supreme Court Rule 83.05(e). However, defendants have cited the applicable rule in the case of In re Ziegner's Estate, 146 Wash. 537, 264 P. 12. There the parties were married in 1910, executed mutual wills in favor of each other in 1912, were divorced in 1916, and in 1917 the state of Washington enacted a revocation statute similar to § 474.420. The court held that although the will was executed prior to the passage of the statute, inasmuch as wills are ambulatory in nature (so also in Missouri, see Starks v. Lincoln, 316 Mo. 483, 291 S.W. 132; Humphreys v. Welling, 341 Mo. 1198, 111 S.W.2d 123) the provisions thereof became effective upon the death of the testator, and the statute revoking provisions for the divorced spouse applied. Decedent's will here was revoked as to his divorced spouse, the plaintiff, by the provision of § 474.420.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C. is adopted as the opinion of the Court.

All of the Judges concur.