STATE OF MISSOURI EX REL. JAMES HENRY BOLSHAW, JR., RELATOR, v. THE HON. JOHN F. MONTGOMERY, JUDGE OF THE PROBATE COURT OF DADE COUNTY, MISSOURI, RESPONDENT.—146 S. W. (2d) 129.

Springfield Court of Appeals, December 14, 1940.

*Charles E. Ginn* and *M. Stanley Ginn* for relator.

*H. W. Timmonds, W. S. Pelts* and *Neale, Newman, Neale & Free-man* for respondent.

TATLOW, P. J.—The relator seeks by this proceeding to compel the probate judge to revoke the letters of administration heretofore issued to one Dovey Schaerer, and to issue the letters to him and permit him to administer the estate. A former proceeding was before this court, seeking a writ of prohibition, which was denied for the reason that it was not the proper remedy. [137 S. W. (2d) 654.] A general outline of the facts appears in that proceeding, which it is not necessary to repeat here. The parties have treated the petition in the instant case as the alternative writ, and the respondent has filed a return thereto, and the case has been argued both on briefs and orally before the court. The court has appointed the Hon. ARCH A. JOHNSON, a member of the Bar of this court, as a commissioner to hear and determine the facts in the case as outlined in the order, as follows:

"Whether the said relator, James Henry Bolshaw, Jr., was, on the 7th day of January, 1939, the date of the death of Oscar Farrar in Dade County, Missouri, a resident of the State of Missouri and an heir at law of said deceased and next of kin so that, under the statutes of descent and distribution of the State of Missouri, he was entitled, on proper application therefor, to administer the estate of said deceased."

Our said commissioner has filed a very carefully prepared and excellent report and has returned therewith a transcript of the testimony and exhibits offered in evidence by the relator and the respondent, together with the depositions of witnesses introduced in evidence.

Our said commissioner finds as a fact that James Henry Bolshaw, Jr., was, on said 7th day of January, 1939, the date of the death of

Oscar Farrar in Dade County, Missouri, a resident of the State of Missouri, and an heir at law of said deceased and next of kin of said deceased, and concludes his opinion with reference thereto, as follows: ". . . So, in my opinion, there can be no question that the relator sustained the relationship of second cousin to Oscar Farrar, deceased. The testimony shows that the relator has for seventeen years held responsible positions with a bank or trust company in the city of St. Louis, and would be a competent person to administer upon the estate."

We have carefully read the report of the commissioner and find that his conclusion is well supported by the evidence and corroborated by court records and documentary evidence extending over a number of years, showing that the deceased was a descendant of Sullivan Farrar and Mary Taylor Farrar, who lived and resided in the State of Iowa. The date of the death of Sullivan Farrar does not appear in the report but was some time prior to the year 1880. Mary Taylor Farrar moved to Lockwood, Missouri, some time after 1880, where she died on the 9th day of December, 1904, at the extreme old age of 104 years. She brought with her her son William H. Farrar, who continued to live with her in Lockwood until 1904, when she died. She also brought with her her grandson, Oscar Farrar, the deceased, whose estate is being administered, who continued to reside with her in Lockwood until her death on December 9, 1904, and who continued to live in Lockwood until his death on January 7, 1939.

This evidence is undisputed except for an effort on the part of Jess Farrar, et al., to show that the deceased was the son of William Farrar, of Lawrence County, in the State of Illinois. In support of this claim there was introduced in evidence the petition for letters of administration on his estate, which petition was filed in Lawrence County, Illinois, on January 28, 1874. The petition recited that William Farrar died in said county on the 11th day of September, 1873, intestate; that he left surviving him no widow. The petition named, among his surviving children, Mary O. Farrar and Mary L. Farrar, and sought to show that Oscar Farrar, the deceased, was the same person as Mary O. Farrar, who, when he was about seventeen years of age, left Illinois and was gone until he reached the age of about twenty-one years, when he returned for a short time and absconded with about $6,000, in money belonging to the estate of William G. Farrar, deceased. All efforts to thereafter locate him proved unsuccessful, except that one witness testified that he saw him on one occasion a number of years afterwards in Poplar Bluff, Missouri.

The William Farrar who died intestate in Lawrence County, Illinois, on the 11th day of September, 1873, and who left surviving him no widow, could not have been the husband of Mary Taylor Farrar, who lived in Lockwood, Missouri, a number of years, and who was the grandmother of the relator, and who did not die until

the 9th day of December, 1904, and with whom Oscar Farrar, the deceased, lived until her death.

The only testimony in the case attempting to identify Oscar Farrar, the deceased, as *Mary O. Farrar,* the son of William Farrar who died in Lawrence County, Illinois, on the 11th day of September, 1873, is the testimony of Nelson Lemery, who had lived in Lockwood all his life; had known Oscar Farrar ever since he was old enough to know anything; that he knew Oscar's grandmother, his uncles, William and Daniel Farrar, and Howard Farrar; that he had known Oscar's grandmother well, "had been in the house a thousand times". In other words, the witness identified the deceased in the instant case as a member of the family of Mary Taylor Farrar, deceased, who, so far as the evidence shows, was in no way connected with William Farrar, who died in Illinois in 1873; yet he testified that, in the fall of 1910, he was working as a carpenter on Oscar's house in Lockwood, and that Oscar Farrar told him that his name was Mary O., or Oscar Farrar. This is an absurdity upon its face and clearly has no probative force. It would not prove anything if the statement was, in fact, made by the deceased. Concerning the testimony of this witness the commissioner found:

"The demeanor of this witness was not the best, and his testimony, which was wholly uncorroborated, was contradicted by all of the pertinent and credible testimony in the case and, in my opinion, is unworthy of belief."

In this finding we fully concur, as evidently do the counsel for the respondent, for, while they have filed exceptions to the report of the commissioner as to his recommendation as to the law of the case, they do not except to his findings of fact.

In addition to his findings of fact the commissioner's recommendation as to the law is:

". . . , the probate court had no jurisdiction to render the judgment decreeing Dovey Schaerer the adopted daughter of Oscar Farrar."

He cites a number of cases to sustain his conclusion.

The only exception to the report is as follows:

"Respondent excepts to the Commissioner's statement, conclusions and recommendations in this regard for the reason that the Commissioner not only had no authority to investigate and report upon the matter involved, that is to say, whether the probate court had the right and jurisdiction for the purpose of determining who should be appointed administratrix of the estate, to determine whether Dovey Schaerer was the adopted daughter of Oscar Farrar, deceased, but for the further reason that the Commissioner has entirely overlooked the basic principle of law involved and has entirely misconstrued the cases cited by him in this connection."

Hence, the sole question for our determination is whether or not the probate court had jurisdiction to determine, on parol evidence

that Dovey Schaerer was, in fact, an adopted daughter of the deceased. The return of the respondent, as recited by the commissioner, expressly concedes that Dovey Schaerer was never adopted by the deceased by deed of adoption as provided by the statutes relating thereto prior to 1917, nor by a proceeding before the juvenile division of the Circuit Court of Dade County, as provided by Chapter 125, Article 1, Sections 14073 to 14083, Revised Statutes 1929.

We think the cases cited by the commissioner: State ex rel. v. Bird, 253 Mo. 569, l. c. 580, 162 S. W. 119, l. c. 122; State ex rel. Fleming v. Shackelford, 263 Mo. 52, l. c. 63, 172 S. W. 347, l. c. 350; Peck et al. v. Fillingham's Estate, 202 S. W. 465, 199 Mo. App. 277; and In re Estate of Huffman, 132 Mo. App. 44, 111 S. W. 848; as well as the recent banc case, State ex rel. Nute v. Bruce, 334 Mo. 1107, l. c. 1115, 1116, 70 S. W. (2d) 854, l. c. 857, conclusively establish that the conclusion of the commissioner is correct. There is no doubt but what our Constitution and statutes confer upon the probate court jurisdiction in all probate matters, and that it may invoke equitable principles in cases where it has original jurisdiction. It, of course, has original jurisdiction to appoint administrators in accordance with the statute. It must determine who are the blood heirs of the deceased, by the facts presented to it, by applying thereto the Statutes of Descent and Distribution, and for the purpose of determining who are the adopted or legal heirs of the decaesed, by applying the statute relating to the adoption of children. In our judgment it clearly has no jurisdiction, either under the Constitution or the statutes, as a mere incident to determine who is entitled to priority of appointment, to undertake to try a *plenary* suit in equity and render a decree which only a court of equity can render, for the purpose of. converting the heirs, devisees, legatees, administrators or executors into trustees to perform the voidable contract of the deceased, which has been so fully performed that it would constitute a fraud upon the party adopted to permit either his heirs, devisees, or legatees to take and receive the beneficial interest in the property in violation of the deceased's contract.

The case of State ex rel. v. Bird, 253 Mo. 569, l. c. 580, 162 S. W. 119, l. c. 122, while recognizing the right of the probate court to apply *equitable* principles in exercising its jurisdiction, says:

". . . While the rule announced in the two cases last cited is undoubtedly sound law, I am not willing to concede that a probate court has jurisdiction to entertain a suit or proceeding, the sole basis of which is a demand for equitable relief, even though such relief should incidentally pertain to some matter of probate jurisdiction."

In the instant case it was certainly not necessary for the probate court to exercise equitable jurisdiction to ascertain who were the blood heirs of the deceased under the Statutes of Descent, or his legal heirs under the adoption statutes. The determination of an equitable adoption for the purpose of converting the heirs, devisees, or legatees

into trustees for the benefit of the person adopted is not even incidental to probate jurisdiction. A suit in equity for such a purpose can be maintained either before or after the estate is finally settled and disposed of in the probate court. We do not have the slightest doubt concerning the matter, but if we were convinced that respondent's contention is sound, we would be concluded by the cases, *supra,* including the case of State ex rel. Nute v. Bruce, 334 Mo. 1107, l. c. 1115, 1116, 70 S. W. (2d) 854, l. c. 857.

Adoption was entirely unknown to the common law. It was recognized only by the Roman or civil law. [Hockaday v. Lynn, 200 Mo. 456, 98 S. W. 585; Clarkson v. Hatton, 143 Mo. 47, l. c. 55, 44 S. W. 761.] As is said in the Clarkson case:

''Adoption was unknown to the common law, being repugnant to its principles and the institution upon which it was builded, but was recognized by the civil law from its earliest day, and exists in this country by the statutes of every State so far as we have had occasion to examine. The child becomes in a legal sense the child of the adopting parents; and at the same time remains the child of its natural parents, and is not deprived of its rights of inheritance from them unless expressly so provided by statute. . . .''

When a court of equity renders a decree converting the heirs, devisees, administrators or executors into trustees for the benefit of the adopted child, he or she does not become, in a legal sense, the child of the adopting parents except for the purpose of receiving title to property. The statute providing for adoption of children in this State was first passed in 1857 (Session Acts, Sec. 4, p. 59). In a case arising prior to the enactment of that statute, it was held by our Supreme Court that an agreement to dispose of property by will in a particular way, if made upon a sufficient consideration, is valid and binding and could be and was specifically enforced. [Wright v. Tinsley, 30 Mo. 389.] This shows that, in such a case, a court of equity is dealing with the question as to who is entitled to the beneficial interest in property, and not with the question as to the artificial relationship created by the adoption.

The last case before our Supreme Court dealing with the question is Shaw v. Hamilton, 141 S. W. (2d) 817, in which it is directly held that a verbal contract to adopt a person so as to receive the property of the person adopted upon his death, either under the Statute of Distribution, or by will, is void under the Statute of Frauds, as well as the Statute of Wills, and that, in such a case, equity will intervene to prevent the perpetration of a manifest fraud *only* in exceptional cases, and, to secure such intervention, a very high degree of proof is required.

In a comparatively early case dealing with the question, Sharkey v. McDermott, 91 Mo. 647, l. c. 654, it is said:

''. . . Her rights in the premises, if any, depend, we think,

entirely upon said agreement and the action had thereunder by the parties thereto. . . . ,''

This thought runs through all of the Missouri cases on the subject, which are too numerous to cite, as shown by the Shaw case, *supra*, where it is said that six essential elements must be proven in such a case, the fifth of which is, ''the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged was in fact made, and that full performance, so far as lies in the hands of the parties to perform, has been had.'' The sixth requirement is as follows: ''and the work constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be reasonably referable to some other and different contract.''

Hence, in the instant case, the right of Dovey Schaerer depends entirely upon the alleged contract of adoption, and the performance thereof by her.

Even a court of equity could not entertain a suit to specifically enforce a verbal contract to establish the artificial relationship of parent and child by adoption for the sole purpose of conferring upon the alleged adopted child the preferential right to administer the estate of the deceased, for the reason that it would constitute a trafficking in the office of administrator and would be void as against public policy. [Nute v. Fry, 125 S. W. (2d) 841, 344 Mo. 163 (en banc).]

A suit to establish an equitable adoption, from its beginning during its process and at its conclusion, requires the exercise of powers which can be exercised only by a court of equity in a single suit with adversary parties, pleadings, and issues, and proceeding according to the process, the rules and principles peculiar to and which are recognized *only* by a court of equity, in contradistinction to a common-law court, and ending in a decree instead of a judgment, and dealing with the duty of the party to account for and turn over property to which he holds the legal title, but which, in equity and good conscience, belongs to the one claiming to be so adopted, and which would constitute a palpable fraud if those claiming under the deceased were permitted to deny the adoption. Such a suit can be presented after the estate is finally settled, against those receiving only the legal title to the property. Such a suit cannot be maintained for the sole purpose of establishing an artificial relationship by adoption, to enable the party to exercise an office to which he has neither an inherent or a statutory right. Such a case falls naturally in that class of cases in which a court of equity has *exclusive* jurisdiction and with which a court of law has nothing to do and can afford no relief. [Morris v. Hanssen, 336 Mo. 169, l. c. 178, 78 S. W. (2d) 87; State ex rel. Brigance v. Smith, 135 S. W. (2d) 355, l. c. 358, par. 7.]

The only possible conclusion that can be reached in the instant case is that the relator is entitled to administer the estate of the deceased.

A peremptory writ of *mandamus* is awarded in accordance with the prayer of the petition, which the parties have treated as the alternative writ, directing John F. Montgomery, as Judge of the Probate Court of Dade County, Missouri, to set aside the order issuing to Dovey Schaerer letters of administration, and to cancel the letters so issued, and to issue letters of administration to the relator, James Henry Bolshaw, Jr., upon his proper application therefor and his giving a bond as required by law, and that the said Dovey Schaerer be required to turn over to the said relator, after his qualification as aforesaid, all of the property and effects which came into her possession, belonging to the deceased, and which she received under her appointment as such executrix, and to do so without further delay, to the end that the estate of said deceased may be administered according to law. *Smith* and *Fulbright, JJ.,* concur.