HARRY SHAW, CORA SHAW, BERTHA M. SHAW and LOUISE S. HORNSBY, Appellants, v. CHARLES R. HAMILTON, as Executor of the Will of ALICE ROZIER SHAW, and as Trustee under her said Will, MARIE C. ROZIER, MAUDE R. HARRISON, ZOE R. LEUER, FRANCIS J. ROZIER, HENRY L. ROZIER, and EDGAR J. ROZIER, Defendants, JOSEPH H. SHAW, Intervenor.—141 S. W. (2d) 817.

Division One, June 28, 1940.

*Bryan, Williams, Cave & McPheeters* for appellants.

*Cox, Blair, Kooreman & Wallach* for Edgar J. Rozier.

*Nagel, Kirby, Orrick & Shepley* for Charles R. Hamilton, Executor of and Trustee under will of Alice R. Shaw; *H. A. Hamilton* for certain other respondents.

372

DALTON, C.—This is an action in equity to secure specific performance of an alleged oral contract to make a will.

The petition alleged that Edgar F. Shaw and Alice Rozier Shaw,

his wife, "entered into a contract by which each of them agreed that such property as either of them should receive by will from the other, and which should not be consumed by the one who should receive it, would be given by the will of the survivor to the family of the one from whom such property should be received;" that in reliance upon said contract Mr. Shaw devised and bequeathed his property to Mrs. Shaw, who accepted and received the property subject to the provisions of the contract; that she held and possessed said property at the time of her death; and that she breached the "contract by not giving by will all of the above described property which she had so received by will from her husband to plaintiffs."

Two sisters and a niece and a nephew of Mr. Shaw are plaintiffs. The executor, a trustee and the beneficiaries under the will of Mrs. Shaw are defendants. Plaintiffs seek a decree vesting title in them to all of said property received by Mrs. Shaw from Mr. Shaw which was possessed by her at the time of her death.

An intervening petition was filed on behalf of Joseph H. Shaw, another nephew of Mr. Shaw, who claimed to be a beneficiary of the alleged contract. Plaintiffs claimed, however, that he was not considered a member of the Shaw family. The plaintiff's petition originally charged that the oral contract was made for the benefit of the Shaw "heirs," but, after the filing of the intervening petition, they amended their petition to read "family," and alleged that only the plaintiffs were considered members of the Shaw family. The court found the issues in favor of the defendants and against the plaintiffs and intervenor, and dismissed both petitions. After motion for a new trial had been filed and overruled the plaintiffs appealed.

Mr. and Mrs. Shaw were married in 1890. At that time Mr. Shaw was traveling for the Brown Shoe Company, and neither Mr. Shaw nor any of the Shaw family were well-to-do. Mrs. Shaw, on the other hand, came from the very wealthy Rozier family of St. Genevieve, Missouri. In 1900 she inherited much property from her mother's estate. Later she inherited from another member of the family. Mr. Shaw remained with the Brown Shoe Company and finally accumulated a fortune far in excess of that of his wife. It consisted primarily of Brown Shoe Company stock. The date when Mr. Shaw's property became equal to and began to exceed that of his wife does not definitely appear from the evidence, perhaps not until after 1917. Mrs. Shaw owned the home and maintained it out of her own funds and continued to keep her property separate from that of her husband. Welton Rozier, a nephew of Mrs. Shaw attended to her business affairs during his lifetime and, after his death in 1928, Mr Charles Hamilton, an attorney, attended to her business affairs. Mrs. Shaw was a woman of few words, not talkative, and never talked much about her affairs or anything else to anyone. She was a woman

of sterling character, perfectly honest and honorable and was the kind of person who would keep her agreements. Mr. Shaw was of the same type. Mr. and Mrs. Shaw were devoted to each other and both were deeply religious. The Shaws never had any children. They were very friendly, close and cordial to the members of both the Shaw and Rozier families.

Edgar F. Shaw died in 1931. By his will he made certain bequests, including a total of $45,000 to the appellants, and then gave the residue of his estate to his wife "absolutely and forever." The will further provided that, in the event that his wife predeceased him, his estate should be distributed among the appellants in accordance with certain percentages mentioned in the will. No different provision was made for the disposition of any property which he might receive from his wife by will in the event that she should predecease him and leave any property to him by her will. The will was accompanied by two letters directed to his wife.

The first letter, among other things, contained the following provisions: "I want you to have all the property which you receive from my estate as yours absolutely, to do with as you desire; and you are to be hampered in no way by any person in the disposition of this property.

"However, I suggest that you make a provision in your will stating that all property which you received from my estate, and which you have not disposed of during your lifetime, you give to my sister, Mrs. Louise S. Hornsby, or if she be dead, to her daughter, Marie Louise Hornsby, and to my sister, Miss Cora Shaw, and to my niece, Bertha M. Shaw, and to my nephew, Harry Shaw.

"I hope that you will understand this only to be a suggestion, and that this shall not prevent in any way your using all property which you may receive from my estate in any manner you may desire, whether same be for your own use; for any charitable purpose or institutions; or any other manner or purpose whatsoever."

According to Mr. Hamilton, who drafted the will and the final copy of the letter, Mr. Shaw's purpose was to suggest to Mrs. Shaw that she leave part of the property to Mr. Shaw's people, but he wanted it to be a suggestion and nothing else, and the letter was intended to be so written that Mrs. Shaw could not help but understand that the property was hers absolutely.

The second letter stated: "I have this day executed my last will and testament, and after making specific bequests of fifty-seven thousand dollars, ($57,000), I have provided that everything else, which I may own at the time of my death, shall become your absolute property." He then expressed the desire that the tenant of his farm in Washington County, be allowed to buy the farm, if Mrs. Shaw wanted to sell it. The will and these letters were dated July 13, 1929. A previous will dated July 5, 1928, and two letters to

Mrs. Shaw, were of similar import to those dated July 13, 1929, except that the first letter accompanying this will used the word "request" in place of the word "suggest," and did not so clearly indicate that the property "was hers to do with as she pleased."

At the time of Mr. Shaw's death, Mrs. Shaw owned property of the approximate value of $128,000 and it is admitted that Mrs. Shaw received from Mr. Shaw's estate personal property of a value in excess of $500,000, and certain real estate. When Mrs. Shaw qualified as executrix of her husband's estate, she signed the affidavit to the inventory to the effect that "she was not indebted or bound in any contract to the deceased at the time of his death except as stated in the inventory." The contract pleaded was not mentioned therein.

Mrs. Shaw died in 1936 and by her will, dated April 26, 1935, after certain bequests, not important here, she left the major portion of her estate in trust for the benefit of her sister, Marie C. Rozier, with provision that after the death of the sister, certain legacies should be paid, including $45,000 to the appellants herein, and provided that one-half of the remainder should be distributed in equal parts to four of the respondents, and that, upon the death of Edgar J. Rozier, the remaining half should be distributed to the same respondents. The detailed terms need not be stated. The inventory of Mrs. Shaw's estate showed real estate, stocks and bonds having a value in excess of $300,000 which were also inventoried in her husband's estate.

Mrs. Shaw had previously executed three other wills. The one executed prior to Mr. Shaw's death provided that Mr. Shaw should take half of her estate, but, in the event that he should predecease her, that all of her estate should go to certain of her relatives. None of Mr. Shaw's people were mentioned or provided for in said will, and no different provision was made for the disposition of any property which she might receive from her husband in the event he would predecease her and leave property to her by will. Another will, executed about six months after her husband's death, was quite similar to her last will, in that it provided special legacies for the members of the Shaw family, mentioned in her husband's letter, for a total of $60,000, but there was no provision that these legacies be subject to any life estate. A third will executed January 27, 1933, provided for legacies for $55,000 to the appellants, but not until after the death of Marie C. Rozier.

There was evidence that at the time Mr. Hamilton prepared Mrs. Shaw's last will that Mrs. Shaw mentioned to Mr. Hamilton "that Mr. Shaw had accumulated quite a good deal of money and some of that money was accumulated because of the fact that she, Mrs. Shaw, had always had more or less money of her own; that she owned the house, for instance, that they lived in, and had lived in, for many years; that she kept up the house so far as taxes and repairs were concerned; and that she, having money and spending her money on

herself and the house, gave an opportunity to Mr. Shaw to accumulate more than he would if she hadn't done that.''

With reference to the alleged contract the evidence shows that a few days after Mr. Shaw's death, Mr. Hornsby, and his wife, who was a sister of Mr. Shaw, were invited to the Shaw residence to hear Mr. Shaw's will read. However, only Mr. Hornsby was invited into the room to hear the reading of the will. Present in the room were Mrs. Shaw, Mr. Hornsby and Mr. Hamilton. According to Mr. Hornsby, Mr. Hamilton read the will and a memorandum or a letter, hereinbefore referred to as the first letter, and that, immediately at the conclusion of the reading of this first letter, Mrs. Shaw stated, ''Yes, we have had that agreement for a long time; that is, whatever either of us got from the other by will was to go back to the family from which it came on the death of the one who received it. And, I intend to keep the agreement.''

Mr. Hornsby thought that the original will was read. However, according to Mr. Hamilton, only Mr. Hamilton's office copy of the will was read, and copies of both letters were read, and there was no interruption between the reading of the two letters. Mr. Hamilton stated positively that no statement was made by Mrs. Shaw with reference to any such contract at any time and that no one said anything between the reading of the two letters. According to Mr. Hamilton's version, immediately after the reading of the copy of the will and the letters, Mrs. Shaw was advised that the first step was to secure the original will from Mr. Shaw's lock box in the Mercantile Commerce Bank and Trust Company; that Mrs. Shaw expressed a dread to go down to Mr. Shaw's lock box; that thereupon Mr. Hornsby suggested that Mrs. Shaw give the key and a letter to Mr. Hamilton. and that perhaps the will could be secured in that manner and filed for probate; that Mr. Hamilton agreed to have such a letter prepared; that such a letter was later prepared, signed and the will secured and probated. The original of this letter was produced at the trial by officers of the Mercantile Commerce Bank and Trust Company. Mr. Hornsby had no recollection of any second letter being read, when the will was read, but he seemed to have some information with reference to its contents. He had no recollection of the conversation with reference to securing the will from the lock box.

Mr. Hornsby was more than 80 years of age at the time he testified. He was an attorney and trust officer for the Tower Grove Bank and Trust Company. He was a graduate of Washington University Law School and had practiced law since 1877. For four years after 1901 he was president of the city council of the city of St. Louis. He had known Mr. and Mrs. Shaw and their families since 1880. His wife, a sister of Mr. Shaw, is one of the appellants. He was subjected to extensive cross-examination with reference to a deposition given by him with reference to Mrs. Shaw's statement, and also with reference

to a statement he was claimed to have made in the presence of the attorneys for the parties to this proceeding. There is some variation in his testimony and there was evidence that his memory was not very clear on certain matters. There was evidence that, at a conference between attorneys for the parties here, Mr. Hornsby had stated "that Mrs. Shaw had said that they had an agreement that they were to leave substantially all of their property to each other, and that what the survivor received from the one first dying the survivor would leave to the family of the one first dying." On the other hand, Judge Cave, an attorney for appellants testified that Mr. Hornsby did not, at the conference, make any statement as to what Mrs. Shaw had said about the agreement.

An effort was made by appellants to rehabilitate Mr. Hornsby's testimony by the testimony of Mrs. Hornsby, Bertha Shaw, and Harry Shaw to the effect that, shortly after the reading of the will to Mrs. Shaw in the presence of Mr. Hornsby, that Mr. Hornsby had told these parties about Mrs. Shaw's alleged statement with reference to the alleged contract. They testified as to what Mr. Hornsby told them at that time, and their testimony tended to corroborate Mr. Hornsby. Mr. Hornsby further testified that he had told his wife, that, "under the will and the letter and Mrs. Shaw's statement," he felt that Mrs. Shaw was obligated to give the Shaw family what she would get from Mr. Shaw. The words "and Mrs. Shaw's statement" were put into his deposition when he read it over before he signed it. There was also testimony that after Mrs. Shaw's will was probated, Mr. Hornsby read it, and seemed very much shocked to learn that Mrs. Shaw had not carried out the contract, since he felt that Mrs. Shaw was obligated to carry out the contract she had spoken of.

Mr. Hornsby said that he remembered the statement by Mrs. Shaw at the reading of her husband's will, because of the fact that the Shaw family had always expected that under their brother's will they would receive a substantial portion of his estate; that he remembered the statement of Mrs. Shaw since it was a matter in which his wife was materially interested and consequently the matter impressed itself upon his memory; that his memory had been refreshed by repeating it every once in awhile to the members of his family and that they "would kind of in a laughing way talk of the thing, that some day the Shaws" would be rich.

Mr. Charles Hamilton, who had practiced law in St. Louis since 1904, and had prepared two different wills for Mr. Shaw and four for Mrs. Shaw, never heard anyone mention the alleged oral agreement at any time before Mrs. Shaw's death.

James A. Ballard, a third cousin to Mr. Shaw and to two of the appellants, testified that in 1917, while discussing matters in the office of the Brown Shoe Company in St. Louis, Mr. Shaw told him, referring to Alice, his wife, "Allie and I have an agreement that any

money that I might leave her, or any property I might leave her, that she has not used at her death, she will give back to my family. And the same applies to her property." The witness also quoted Mr. Shaw as follows: "Allie and I have an agreement that whatever I leave her, if I die first, that she will—whatever is left she will give to my people; and the same applies to her." The witness further stated that Mr. Shaw mentioned the agreement to him six or seven times, and as late as 1927. The witness said he remembered it because he thought "that it was an awful fine thing for" Mr. Shaw to do.

J. W. Settle, an old friend of Mr. Shaw, testified that in 1917 they were discussing a Judge Ebersole, who had married and received money from his wife, and then died without a will, and the Ebersole heirs had claimed half of the estate; that Mr. Shaw stated that nothing like that would happen to him because he had made arrangements; "that the survivor of he or his wife—which ever one survived the other—was to return to each family the amount that each had at their deaths"; . . . "that is, if he died first he was to leave his property to his wife, for her to use it all if she needed it, and at her death it was to go back to the Shaws; and the same way with Mrs. Shaw—should she die first he was to have the use of her money, and at his death it was to go back to the Roziers." The witness admitted that he could just remember the outline of what Shaw said.

Appellants contend that the statements of Mr. and Mrs. Shaw, their wills, the letters, and the surrounding facts furnish clear, cogent and convincing proof, beyond a reasonable doubt that the contract was in fact made, as alleged, and was relied upon by Mr. Shaw, when he executed his will in favor of his wife, and that the decree should have been for appellants.

Respondents contend that the alleged contract is within the statute of frauds and the statute of wills and, therefore, void; that its terms, conditions and its beneficiaries remain indefinite and uncertain, and unestablished by a proper quantum of proof; that Mr. Shaw's will was not executed in reliance upon the contract and is not referable to it; that part performance, essential to relieve the case from the statute of frauds, was not established; that the alleged contract, between husband and wife, is harsh, inequitable and unenforceable; and that appellants are barred by laches.

In an equity case we are not bound by the findings of the chancellor, but we review the evidence and reach our own conclusions as to its weight and value. If the substantial weight of the evidence sustains the findings, we will not, as a rule interfere. We give great weight to the findings of the chancellor, and, particularly so where there is a conflict of verbal testimony involving the credibility of witnesses, and we usually defer to the findings below, unless satisfied that they are against the weight of the evidence. [Daudt v. Steiert (Mo.),

205 S. W. 222, 225; Conrad v. Diehl, 344 Mo. 811, 129 S. W. (2d) 870, 876.]

In this case the alleged contract involved real estate and a large amount of personal property. It was not in writing. The will was not made in accordance with the alleged contract. Appellants seek to establish the alleged contract by the declarations of deceased parties with reference thereto, and to secure the property in the absence of such will. No written instrument directly tends to show that such a contract was ever made. Under the statute of frauds and the statute of wills the alleged contract is void and unenforceable at law. Appellants, however, contend that Mr. Shaw relied upon said contract and transferred substantially all of his property to Mrs. Shaw by will and in reliance upon said contract; that such part performance by Mr. Shaw takes this case out of the statute; and that relief may be had in equity, since equity will not permit the statute to be used as a cloak for fraud.

Equity will interfere only in exceptional cases to prevent the perpetration of a manifest fraud. To secure such intervention a very high degree of proof is required. The circumstances under which a court of equity will interfere are well stated by Judge GRAVES in the case of Walker v. Bohannan, 243 Mo. 119, 136, 147 S. W. 1024, as follows: "(1) The alleged oral contract must be clear, explicit and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged, was in fact made, and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) the work constituting performance must be such as is referable solely to the contract sought to be enforced, and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration, so that its performance upon the one hand, but not upon the other, would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; and (8) proof of mere disposition to devise by will or convey by deed, by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed, made before the acts of performance relied upon were had."

In the case at hand the question of part performance of the alleged contract, to-wit, the execution by Mr. Shaw of his will in reliance thereon is an essential issue. In the case of Kirk v. Middlebrook, 201 Mo. 245, 289, 100 S. W. 450, Judge LAMM states the rule with reference to proof of performance as follows: "Performance on the part of the promisee should be shown, and that performance

must be unequivocal, and must in its own nature be referable alone to the very contract sought to be performed because it is only by performance (whereby the party to be charged is benefited), that the conscience of the promisor and those claiming under him is bound; . . . and the acts relied on to show performance must point to the contract in suit and to none other.'' The above rules have been approved by many subsequent decisions of this court. No relief may be granted upon the basis of an oral contract, such as is here sought to be enforced, except where the proof 'of the oral contract, its terms, character and the part performance thereof, is so clear, cogent, positive and convincing as to leave no reasonable doubt in the mind of the chancellor. [Norton v. Norton (Mo.), 43 S. W. (2d) 1024, 1032; Keller v. Lewis County, 345 Mo. 536, 134 S. W. (2d) 48, 51.]

The parties to this appeal have briefed at great length and with pains-taking care all of the many issues in this case, including the admissibility of different items of evidence, objected to by respondents, and admitted over objection. We have considered the entire record carefully in the light of the authorities cited. The parties are in accord upon general principles of law concerning this case, but not with reference to competency of certain witnesses and the admissibility of testimony. In view of the conclusions we have reached with reference to the disposition of the case, it is unnecessary to set out our conclusions with reference to many matters briefed by the parties. The errors assigned are that the decree should have been in favor of appellants, and that the court erred-in dismissing appellant's petition.

Proof of the alleged contract rests wholly in parol. The time of making the contract does not appear. Its terms are not established, but appear solely from alleged declarations of deceased persons about the contract. These declarations are not entirely consistent. They suggest different terms. According to the alleged declarations of Mrs. Shaw, there was no obligation on the part of either to will anything to the other, and no provision was made for any of the property to be consumed by the one who should receive it from the other. "Whatever either . . . got from the other by will was to go back to the family from which it came." According to Mr. Settle, Mr. Shaw said the agreement was that the one that died first was to leave all property to the other and only the amount left was to go back to the family of the one from which it came. According to Mr. Ballard, Mr. Shaw said nothing about any agreement by either to give anything to the other, but, that whatever was left over of the amount which might be given, was to be returned to the family or people of the one from which it came. Each statement points to a contract with different terms.

The beneficiaries of the alleged contract are not determined with certainty. In the original petition appellant used the words ''heirs.''

In the amended petition the word "family" was used in lieu of the word "heirs." Witness Ballard quoted Mr. Shaw as using the word "family" and "people" interchangeably. Other witnesses testifying as to Mr. Hornsby's statement about the declarations of Mrs. Shaw quoted him as using the word "relatives," in place of "family." Intervenor seeks to be included within the term "family" and appellants contend he was not so considered. We are of the opinion that the nature and terms of the alleged contract and its particular beneficiaries were not established with definiteness by satisfactory and convincing evidence.

Mr. Hornsby was the only witness who testified to any declaration by Mrs. Shaw with reference to the alleged contract. This alleged declaration of Mrs. Shaw at the particular time, place and under the circumstances mentioned by Mr. Hornsby, was expressly, denied by Mr. Hamilton. In addition Mr. Hornsby's testimony must be viewed in the light of his interest, his expectations, his conclusions, and the condition of his memory as disclosed by this record. Appellants concede that Mr. Hornsby "did not at all times testify in the exact same words" and sometimes failed to make the whole statement, or to give all the facts, but contend that his testimony, together with the terms of Mr. Shaw's letter, established the contract. We shall refer to the letter later. The credibility of all of the witnesses and the weight and value to be given their testimony is very important in this case. We have before us only the cold record; much of it is in narrative form, with questions and answers omitted. The trial court had an opportunity to see and hear the witnesses, observe their attitudes and capacities, and disposition to tell the truth. These matters are not necessarily reflected in the record and for that reason weight must be given to the findings of this court. The trial court had a better opportunity to determine the weight and value of the oral testimony.

Even if it be considered that the contract was made as alleged, the appellants would not be entitled to relief. The evidence fails to establish that Mr. Shaw relied upon said contract and transferred his property by will to his wife in reliance thereon. Performance by Mr. Shaw in reliance on the particular contract is not shown by clear, cogent and convincing evidence. The act of Mr. Shaw in making his will to his wife was not unequivocal and of its own nature referable solely and alone to the existence of the alleged contract. It cannot be said that Mrs. Shaw secured the property in question because of Mr. Shaw's reliance upon the contract sued on. It was not established that the will was executed by Mr. Shaw in performance of the contract and for no other reason. In the ordinary course of human events one would have expected the husband to transfer all or a large portion of his estate to his faithful wife even in the absence of such a contract. It must be remembered that the evidence shows these parties

were devoted to each other and that for more than forty years they had resided together as husband and wife. It must further be remembered that the widow, under the facts here, was entitled to one-half of her husband's property even in the absence of a will, and that she could have renounced the will and taken one-half of the property, absolutely, subject to the payment of the husband's debts. Under such circumstances the execution of Mr. Shaw's will in favor of his wife cannot be said to be of its own nature referable alone to the very contract sought to be enforced, and to nothing else. [Walker v. Bohannon, supra (243 Mo. l. c. 140, 147 S. W. 1024).]

Appellants contend that the wording of Mr. Shaw's first letter indicates a reliance upon the contract and that the letter was intended to call Mrs. Shaw's attention to the contract. It is further insisted that the letter indicates that Mrs. Shaw was merely to have the use of the property. We do not so read or understand the letter, particularly when the will and the two letters are read together. In fact, there is such an inconsistency between the will and the letters accompanying it and the alleged contract, that if such contract ever existed, it was wholly abandoned. The use of the words "absolutely and forever" in the will, the use of the words "to do with as you desire," "your absolute property," and the reference to "disposition of" the property, in the letter are inconsistent with any theory that Mrs. Shaw took the property in trust and was already bound by a solemn contract to will all of the property remaining on hand at the time of her death to appellants.

The suggestion in the letter that she will the remaining property to appellants is inconsistent with any absolute right in Mr. Shaw to have the property transferred to appellants. The first letter indicates to us that the matter of appellants receiving any of the property was left to the absolute discretion of Mrs. Shaw. The will by which the property passed to Mrs. Shaw is definite and certain. The estate transferred to her is not ambiguous. The letters are equally definite and certain and their meaning clear. The terms of the will and the content of the letters are, in our opinion, inconsistent with the existence of the alleged contract at the date of the execution of the will. They are equally inconsistent with appellants' theory that the will was executed in performance of the alleged contract.

We may not overlook the fact that the evidence shows Mrs. Shaw to have been a very religious, faithful and conscientious woman, devoted to her church and the type of woman who would keep her contracts. Appellants do not question that Mrs. Shaw's high character is a proper matter to consider, nor do they question the rule of law that, in the absence of evidence, the law presumes that one acts honestly, "by the right and not by the wrong." Appellants concede that they are charging Mrs. Shaw with breach of contract and fraud, but say "only to the same extent that every defendant in a

suit for a breach of contract is charged with fraud.'' In this statement appellants overlook the fact that the parties to the alleged contract are dead; that the contract was not in writing; that no will was made in accordance with the terms of the alleged contract; that appellants seek relief in the face of the statute of frauds and the statute of wills; and that under the established rules of law a very high standard of proof is required to establish the contract, its terms and conditions, and part performance in reliance thereon.

Our conclusion is that the evidence in this case fails to measure up to the high standard required as a condition precedent to the granting of any relief to appellants. The weight of the evidence does not preponderate in favor of appellants. We are of the opinion that the trial court reached a proper conclusion. The judgment is affirmed. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.