MINNIE MABEL THOMPSON, Respondent, v. ST. LOUIS UNION TRUST COMPANY, a Missouri Corporation, Trustee of Trust Estate of CHARLES HENRY THOMPSON, Deceased, ST. LOUIS UNION TRUST COMPANY, a Missouri Corporation, Executor Under Last Will of CHARLES HENRY THOMPSON, Deceased, MASONIC HOME OF MISSOURI, a Corporation, and GEORGE WASHINGTON LODGE, Nô. 9, A. F. & A. M., Appellants, No. 43049—253 S. W. (2d) 116.

Division Two, November 10, 1952.
Motion for Rehearing or to Transfer to Banc Overruled, December 8, 1952.

*William R. Gentry* for appellants Masonic Home of Missouri and St. Louis Union Trust Company, as Executor and Trustee, and *Robert C. Brinkman* for appellants George Washington Lodge, No. 9, A. F. & A. M. and St. Louis Union Trust Company, as Executor and as Trustee.

668

*Carl M. Dubinsky, Edward A. Dubinsky* and *Dubinsky & Duggan* for respondent.

TIPTON, J.—This is an action to enforce an antenuptial oral contract entered into between respondent and her deceased husband, Charles Henry Thompson, whereby he agreed to leave all of his property to her if she would marry him and give up her employment of 27 years, thereby losing her pension rights to which she would be entitled if she worked 3 more years. The trial court decreed specific performance of the oral contract. From that decree the appellants have duly appealed.

Respondent and the deceased, Charles Henry Thompson, became acquainted in 1917 when they were both employed in the office of the Southern Railroad in East St. Louis, Illinois. In that year the deceased began to court the respondent and this courtship continued until they were married in November, 1943. Deceased lived with his mother in St. Louis, Missouri, until she died in 1941, and respondent lived in East St. Louis at the home of her mother until her mother's death.

Christmas, 1937, the family of respondent met at her home and deceased was present at that time. On that date deceased gave respondent an engagement ring. Respondent said she would accept the ring and that they would consider themselves engaged but that until deceased's mother came to respondent, welcomed her as a daughter-in-law, and told her she would be welcome in her home

that she would not set a date for [118] the wedding. No such welcome was forthcoming from the mother of deceased.

On December 31, 1937, the deceased executed a living trust. He named himself and the St. Louis Union Trust Company trustees of this trust estate. Under this trust agreement the trustees were to pay the deceased "the entire net income free from trust to Grantor [deceased], in equal monthly or other convenient installments so long as he shall live." At his death "the rest, residue and remainder of the trust estate shall then be paid, free of trust, in equal share to the General Fund of the Masonic Home of Missouri * * * and to the General Fund of the George Washington Lodge, No. 9, A.F. and A.M. * * *." The trust instrument further provided: "This trust is hereby created, and the interests hereunder are vested, subject to the express condition and reservation on the part of the Grantor to alter or amend the terms of this agreement, or to revoke this agreement in whole or in part, * * *' at any time during the Grantor's lifetime, * * *."

The trust fund consisted mainly of property that deceased received upon distribution of the estate of his aunt, Ella Blume, from the Public Administrator of Cook County, Illinois. This property was not received by the trustees until several months after the execution of the trust agreement.

On July 30, 1937, the deceased executed a will which named the St. Louis Union Trust Company as executor. The provisions of the will were almost identical with the provisions of the living trust.

In the latter part of October, 1943, the deceased told respondent that if she would give up her job with the Southern Railroad and set a date for their marriage that he would go to the bank and change all his papers so when he died all his property would go to her. She had worked for the Southern Railroad 27 years and she would be entitled to a pension if she worked for that company 30 years. It was on account of the pension that she hesitated to set a date for the wedding. At first she agreed to marry him at Christmas time but he insisted on an earlier date. She then agreed to marry him after she gave the railroad two weeks' notice.

To celebrate this engagement there was a gathering of her family on the last Sunday in October of that year when she set the wedding date for November 18, 1943. At this family gathering deceased gave respondent another diamond ring. They were married and lived together as husband and wife until he died March 11, 1950.

The deceased failed to change the living trust agreement or his will.

Appellants contend that the alleged contract is an oral one and is, therefore, barred by the statute of frauds, that there can be no recovery on such a contract even after performance of the contract by respondent unless the proof is so cogent, clear and forceful as

to leave no doubt in the mind of the chancellor as to its terms and character.

Mrs. Edna Davidson testified that she was respondent's sister and that she first met deceased in the year 1917; that she was at a gathering of her family at Christmas, 1937; and that at that time deceased gave respondent a diamond ring but she refused to set a wedding date. Mrs. Davidson's testimony in part is as follows:

"A. Well my sister said, 'Charley, I told you no house is big enough for two families,' she said 'Charley, I have told you repeatedly that I would never go into your mother's home and give her the impression that I was trying to drive her out,' and she said 'Until that time I wouldn't set a definite date.'

"Q. What did he say?

"A. Well, he wanted to set a definite date.

"Q. Was there a date set at that time?

"A. No, sir."

This witness also testified that a few days before the family gathering in October 1943 the deceased and respondent were at her home and her testimony as to what occurred on that occasion is as follows:

"A. Well, at that time, Charley turned to me and said, he said, 'Edna, can't you help me to talk to Minnie not to be a chump all of her life,' he said [119] 'Can't you talk some sense into Minnie not to be a chump all her life, I have tried and tried to get Minnie to set a date and she still harps about the pension she has coming, and I have told her repeatedly that that pension, that she had put a lot of money into it, and it don't amount to a lot to her, to pay her,' and he said 'I have told Minnie that I would go to the bank and change all papers in her favor and as long as she lives she will be well cared for, and when I die what I have is hers, what would be more fair than that,' and he even said that he had begged Minnie to do that, and he said 'I have talked to the others about it,' and he said 'See what you can do with her.' ''

"A. Well, Minnie said something about the pension, and not wanting to give up the pension, and Charley said with all these papers he would turn over to her, in her favor is what I mean, and he said that would be around ten thousand dollars a year, and her pension didn't *some* up to that.

"Q. Did your sister agree to set a date?

"A. The matter came up again, and Minnie didn't set a date then, and she left the impression that that was it, and later on it came up again and Minnie says, 'Do I have to give you a definite answer?' and he says, 'Sooner or later it amounts to the same thing,' and Minnie did then agree to set a date, and wanted to set it for Christmas time,—

"Q. Go ahead.

"A. —but Charley wanted an earlier date, he said he was tired living alone and he wanted it at an earlier date, and Minnie said that after all she would have to give the company a notice, and they decided then that Minnie would give them a two weeks' or fifteen days' notice before she quit.

"Q. Was there some suggestion made that night about a family gathering?

"A. I said, 'That calls for the family.'

"Q. What did Charley say?

"A. He seconded the motion.

"Q. And she did arrange for. the family to get together the following Sunday?

"A. Yes, sir, she did."

"Q. Now, on that family gathering on Sunday, the last Sunday in October, 1943, did Charley Thompson make a statement with reference to his property?

"A. I don't understand what you mean.

"Q. On the Sunday that the family were together, in 1943, the announcement Sunday, did Charley Thompson make any statement what would happen to his property?

"A. He repeated what I heard him repeat so many times, that what he had was Minnie's, would go to Minnie, and he said that all of his property would go to Minnie.

"Q. And that statement was made to the members of your family that Sunday?

"A. Yes, we were all there.

"Q. On that Sunday did Charley, in the presence of your sister Minnie, or did Minnie, in the presence of Charley Thompson, tell the family the date they were to be married?

"A. Yes, they did, they told us they would be married on the 18th of the following month."

"Q. Did Charley Thompson and Minnie visit your home any time during the following week after the last Sunday in October, 1943?

"A. Yes, sir.

"Q. And did you observe whether he gave your sister Minnie something on that visit?

"A. Yes, sir.

"Q. What did he give your sister at that time?

"A. A defense bond.

"Q. Did your sister make some comment to Charley about the defense bonds?

"A. Yes, sir.

"Q. What did she say?

"A. She said 'Charley, isn't this a little early for me to be Mrs. Thompson, and live at 3852 Hartford Street?', and Charley said, he seemed happy and he says, 'Minnie, that is not all, the day I bought

these bonds for you', he said, 'I had my papers at the bank all changed,' and he said 'If I should die tonight everything [120] I have is yours,' just like some happy kid giving something."

The testimony of Earl Sandling and his wife, Beulah Sandling, a sister of respondent, was similar to that of Mrs. Davidson. Another sister, Ada Sanner, testified about the family gathering at Christmas in 1937. This testimony was similar to that part of the testimony of Mrs. Davidson.

Mrs. Evelyn Pilger was an employee of the Southern Railroad and she testified to statements made to her by deceased that were similar to those of Mrs. Davidson.

The appellants did not put any witnesses on the stand who contradicted respondent's witnesses in reference to the agreement, nor was there any evidence that would impeach these witnesses. In fact, appellants did not cross-examine any of the witnesses to the oral contract except Mrs. Davidson who testified that she was a widow and that she and her son were in the tavern and restaurant business in East St. Louis. Appellants intimate in their brief that this fact discredits the witness, Mrs. Davidson. With this we do not agree. All large hotels in the large cities have bars. We would not infer that the managers of these hotels are unworthy of belief just because intoxicating liquor is sold in these hotels.

Both appellants and respondent cite the cases of Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, and Shaw v. Hamilton, 346 Mo. 366, 141 S.W. 2d 817, to show what is necessary to prove an oral contract made with a deceased person by a party still living to take the cause out of the statute of frauds by a court of equity where the oral contract was performed by the party still living. Equity will interfere only in cases where it would be a fraud on the person still living to enforce the statute of frauds.

In the case of Shaw v. Hamilton, supra, 141 S.W. 2d l.c. 822, we quoted with approval from the case of Walker v. Bohannan, supra, the circumstances under which a court of equity will enforce an oral contract made with a deceased person. They are as follows:

" '(1) The alleged oral contract must be clear, explicit, and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair, and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged was in fact made, and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) and the work constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate

and legal consideration, so that its performance upon the one hand, but not upon the other, would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed made before the acts of performance relied upon were had.' ''

For the respondent to be entitled to specific performance it is necessary for her to prove that she married the deceased on account of the inducement that he made to her in the year 1943 and not under an agreement made between them in 1937, as contended by appellants.

It is true that respondent did say in 1937 that they could consider themselves engaged, but that was only on the condition that deceased's mother would come to her and welcome her as a daughter-in-law and welcome her into her home. This the mother failed to do. So there was no absolute promise on her part to marry the deceased. It is very evident that deceased knew his mother would not welcome respondent as a daughter-in-law because six days later he executed the living trust in which he did not even mention respondent. It is inconceivable that an ordinary, normal man would [121] become engaged to be married, and then a few days thereafter execute a trust in which he gave practically all his property to charities after his death without even mentioning his prospective bride. We are forced to the conclusion that neither the respondent nor deceased considered there was an actual engagement in 1937.

Since it is conceded that respondent and deceased were married November 18, 1943, it is evident that they were married pursuant to the agreement of 1943. Does that agreement comply with the requirements named in the Walker v. Bohannan case, supra, and approved by our case of Shaw v. Hamilton, supra?

Undoubtedly the proof of the agreement and consideration must be clear, explicit and definite. However, it is not necessary that the agreement be established by direct evidence. It may be supplied by competent witnesses who testify to admissions of the deceased party to the agreement, or an express promise may be shown. Evidence is also admissible of such facts and circumstances, such as relations of the parties, so as to give rise to an implication that such an agreement was made, and such implication may have reinforcement from evidence of the conduct of the parties at the time of making the agreement, and subsequently. Plemmons v. Pemberton, 346 Mo. 45, 139 S.W. 2d 910.

Measured by the above rules, we think the evidence outlined above clearly and explicitly shows that the respondent married the deceased on November 18, 1943, solely as a result of a promise by him that if she would quit her job, necessarily forfeiting her pension, and marry him, he would go to the bank and change his papers so that when he

died she would come into possession of all his property. The changing of the papers at the bank could only mean making a new will and changing or revoking the living trust which under the trust agreement he had authority to do at any time during his lifetime.

Marriage is not only a good but a valuable consideration. Respondent's marriage to deceased would be sufficient consideration for the agreement of 1943. Nowack v. Berger, 133 Mo. 24, 34 S.W. 489, 31 LRA 810, 54 Am St Rep 663; Wood & Huston Bank v. Read, 131 Mo. 553, 33 S.W. 176; Rhoads v. Rhoads, 342 Mo. 934, 119 S.W. 2d 247. In this case there was an additional consideration in that respondent gave up her employment and thereby lost her pension rights.

In their reply brief, appellants say:

"We admit, of course, that an oral contract made in consideration of contemplated marriage, when fully performed by the intended wife and when both the making of the identical contract alleged and the performance of that contract by acts which cannot reasonably be attributed to any other contract, may be enforced by an order of specific performance, but we emphasize the fact, as we did in our original brief * * * that not only must the contract be proved according to the rules laid down in the decisions of this Court, but the performance thereof must also be proved by the same character of evidence and the acts relied upon to prove such performance must be attributable to the alleged oral contract sued on and to no other contract."

We have already ruled that respondent married deceased solely as a result of the agreement of 1943. Therefore, under appellants' admissions above quoted, the respondent is entitled to specific performance of the oral agreement made in 1943.

The evidence in the case at bar complies with all the conditions enumerated in the cases of Walker v. Bohannan, supra, and Shaw v. Hamilton, supra, necessary to take this case out of the statute of frauds in an equitable action.

We hold the decree of the trial court was for the proper party and, therefore, affirm the trial court's decree. All concur.