Aileen G. DAY, Plaintiff-Appellant,

v.

Loretta M. BLACKBIRD, Kathryn Sherrill, Robert E. Sherrill, Marcella King, Frank C. King, Angeline Beckring, Bernard Beckring, Gertrude Winkler, Andrew J. Winkler, James F. Day, Marjorie Day, George L. Day, and Ethel May Day, Defendants-Respondents.

No. 47242.

Supreme Court of Missouri.

Division No. 1.

Jan. 11, 1960.

Rehearing Denied Feb. 8, 1960.

Joseph J. Howard, St. Louis, for appellant.

Morris A. Shenker, Owen G. Jackson, John E. Bardgett, St. Louis, for respondents.

WESTHUES, Judge.

This is a suit for specific performance of an oral contract alleged to have been entered into between plaintiff and her deceased brother, William J. Day. The property involved is a home owned by William valued at about $10,000 and personal property, mostly cash, amounting to about $12,000. The trial court entered a judgment for the defendants and plaintiff appealed.

The defendants in the case are the brothers and sisters of plaintiff and their spouses. The sisters are Loretta M. Blackbird, a widow, Kathryn Sherrill, Marcella King, Angeline Beckring, and Gertrude Winkler. The brothers are James F. Day and George L. Day.

The facts as developed by the evidence are that in 1941 William purchased a family residence. William, often referred to as Bill, never married and, in 1941, after he purchased the residence, his sisters who were then unmarried made their home with him. These sisters were plaintiff Aileen, often referred to as Torchy, Angeline, referred to as Ann, and Gertrude. Bill was the oldest and was considered the head of the family. These four lived together as a family, shared the household expenses and the work necessary to maintain the home. The sisters took care of the cooking and housework and Bill did much of the outside work such as maintaining the yard, painting, and carpenter work. All were employed in gainful occupations. The evidence is that Bill paid for the home, as well as paying the taxes and insurance. It is plaintiff's theory that it was understood and agreed between the four that they would share their living expenses as long as they lived together and upon the death of any of them, the deceased would leave his or her property to the survivors who were then living at the home. The four worked and gradually accumulated some property. It appears from the record that William was able to accumulate a substantial amount. On October 17, 1953, Ann was married and Gertrude was married on May 26, 1956, leaving Bill and Aileen at the home purchased by Bill. Plaintiff claims that after Gertrude announced her engagement, plaintiff and Bill entered into a new contract identical to the earlier contract or arrangement. Plaintiff, in her petition, made the following allegations which form the basis of her claim:

"5. Sometime shortly prior to the 22nd day of April, 1956, plaintiff entered into an oral contract with said William J. Day whereby it was agreed that, after Gertrude Winkler was married in May 1956 and so long as plaintiff and said William J. Day remained unmarried, plaintiff and said William J. Day would continue to live together at 5916 Cates Avenue, St. Louis, Missouri, and that they would share the housework and expenses in connection with said house, and that plaintiff would continue said William J. Day as the beneficiary of insurance on her life and continue to keep her stocks and bonds in her name jointly with that of said William J. Day, and generally leave all her property to him and that said William J. Day would leave his entire estate to plaintiff.

"6. Said William J. Day died without making a valid will, but did leave a paper written in his own handwriting and signed by him through which he attempted to leave his entire estate to plaintiff, which paper

was offered for probate in the St. Louis Probate Court and rejected on the 18th day of October, 1957.

"7. Plaintiff has fully performed her part of said agreement, but said William J. Day died without leaving his estate to plaintiff as he had agreed."

A photostatic copy of the paper writing, referred to in paragraph 6 of the petition, follows:

**454**

The defendants Kathryn Sherrill, Marcella King, their spouses, and Loretta M. Blackbird filed answers to plaintiff's petition wherein they denied the allegations of paragraphs 5, 6, and 7 of plaintiff's petition. Kathryn Sherrill, after she had entered her appearance as administratrix of William's estate, also filed an answer as administratrix. The other defendants did not file an answer.

The defaulting defendants were witnesses for plaintiff. The answering defendants, except for Loretta M. Blackbird who was unable to attend the trial, were witnesses for the defense.

The court, in the finding of facts and conclusions of law, ruled that the evidence was insufficient to sustain plaintiff's claim; that, at most, the evidence indicated a testamentary disposition on part of William to leave his property to Aileen. Plaintiff claims that the trial court erred in so holding.

This being a case tried before the court without a jury, it is reviewable de novo on appeal. In such cases, where there is a conflict in the evidence and the evidence is oral, an appellate court defers to a great extent to the finding of the trial judge. The conclusions of law as made by the court, finding that the evidence was insufficient to support a finding for plaintiff, reads: "That the evidence of the plaintiff at most *indicts* (indicates) a testamentary disposition on the part of William J. Day to make a gift to plaintiff not bottomed upon any contract, nor as a reward for any special services, or attentions rendered, but more so found upon a close affectionate brother and sister relationship."

We shall now review the evidence upon the disputed issues. Ethel M. Day, wife of

George L. Day and a witness for plaintiff, gave the following testimony with reference to the relationship between plaintiff and the deceased:

"Q. Did you ever hear William discuss what was to happen to his property after his death? A. Yes. Bill and Torchy would come over to our house quite frequently, especially after Gertrude had married, and the two of them were left alone together. They would come over sometimes just in the evening they would drive over. Quite often my husband and Bill would get into a discussion about financial matters, and Bill and Torchy both remarked on several occasions that if anything ever happened to either of them, they wanted all of their possessions to go to the other one, since the two of them were the only two left at home, it was only natural to be that way. They both wanted it that way. That's the way they intended it to be."

Gertrude Winkler was the last to be married. She testified that while she, her sisters Ann and Aileen, and William lived together at the home it was understood among them that whoever died would leave his or her property to those who were then living at the home. With reference to the agreement between plaintiff and the deceased, she stated that, on the Sunday before Bill's death, she and he had a conversation to the following effect: "I was again suggesting he make out a will. He said he had it written down and I told him, I said that it would be a lot of discussion later on. He said, 'I have it written down. She's carried out her part of the agreement with me.' And he said, 'She will get what is coming to her for it.'"

The record in this case is replete with evidence from plaintiff's witnesses that the deceased intended to leave his property to plaintiff. Deceased had been asked on a number of occasions whether he had made a will. The reply, as a rule, was that he had. There was evidence that deceased was

under the impression that a will written in his own handwriting was sufficient and no witnesses were necessary. The paper writing left by the deceased supports that evidence.

George L. Day, a brother, testified in part as follows:

"Q. What was the nature of your conversation that you had with William approximately three months prior to his death? A. I asked him if he had ever made a will out.

\*    \*    \*    \*    \*    \*

"Q. (By Howard) Why did you ask him that? A. Just in conversation, but I asked him because he owned property, and he knew that he had told me that he intended for his property to go to Aileen and the family when he died and that was—I asked him if he had made it out. I asked him the Saturday night before that.

"Q. What did he say when you asked him about that? A. This last time?

"Q. Yes. A. He said, 'Well, I have got that taken care of.'

"Q. You started to say something further in connection with that conversation. A. You want me to carry on through?

"Q. First tell all of the conversation you had three months before his death. A. I asked him if he had a will made out, and he said, 'Yeah, I have got that taken care of.' And along these lines—this isn't exactly word for word, and so we talked a little bit more, and he said to me, 'Have you got one *one* made out?' And I said, 'No, I haven't yet,' so I was lost for giving him advice on making a will out. I didn't have one made out myself.

"Q. Was that all of the conversation you had with him at that time? A. No, he told me that he intended to have it made up where everything was go-

ing to Torchy, because she had done a good job and fulfilled her end of the deal between them and that he was going to leave it to her, and I said, 'You know Bill, if you did, Kathryn and Marcella would be claiming their part of your money.' And I said, 'They are the ones you least want it to go to.' He said, 'It wouldn't do them any good.'"

James F. Day, also a brother, gave similar evidence, a part of which follows:

"Q. What did he tell you in relation to the household expenses? A. The household expenses were share and share alike, the same as they had always been through the years when the other sisters were there.

"Q. Did you ever discuss with Bill what disposition he intended to make of this property at the time of his death? A. I practically insisted upon brother Bill making some form of will. He had his own way of running his business and sister's business, but I suggested to him in making a will.

"Q. Why did you suggest that he make a will? A. The reason I suggested that he make a will was—there was an agreement between the parties.

"Q. Between what parties? A. Between the sisters and at the time of his death it was sister and he as to the disposition of their property.

"Q. What sister are you referring to? A. To Aileen.

*    *    *    *    *    *

"Q. Did he tell you what the agreement was? A. Yes, he told me what the agreement was.

"Q. What was the agreement?

*    *    *    *    *    *

"A. The agreement was that as long as the two lived together that the termination of either one, the one that was left was to get what both parties—if Bill died it all went automatically to Torchy. If Torchy died, it automatically went to Bill.

"Q. Was that all of the agreement? A. As far as I know, it's all of the agreement.

"Q. Is that what he told you? A. That's what he told me."

It was in evidence that while Bill and his sisters lived together, each one of them purchased some Government Bonds naming one or the other of them as co-payee. It was further shown that plaintiff named Bill as co-payee in bonds and as joint owner in stock and that he was made a beneficiary in a life insurance policy.

Witnesses for the defendants gave testimony diametrically opposed to that of plaintiff's witnesses with reference to the existence of a contract between plaintiff and the deceased and to the intention of William in the disposition of his property. We need not relate this evidence but the substance was that Bill had stated on numerous occasions that he was not going to make a will but instead was going to leave it to the Probate Court to divide his property.

Plaintiff relies upon an oral contract made by her and her deceased brother after her sister Gertrude became engaged and married in the spring of 1956. She so stated in her petition and, during the trial, her attorney informed the court that "the contract sued upon was made when Mrs. Winkler got married and left home."

■ Plaintiff, in her brief, cites the case of Jennings v. Achuff, Mo., 272 S.W.2d 263, in support of her claim that the trial court erred in finding against her. In that case, this court quoted at length from the case of Thompson v. St. Louis Union Trust Co., 363 Mo. 667, 253 S.W.2d 116, loc. cit. 120, 121, which in turn quoted with approval the rulings made in Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024. In substance, this court, in the Walker case, held that the alleged oral contract must be clear; that it cannot be established by conversations ei-

ther too ancient on the one hand, or too casual upon the other; that proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged was in fact made; that proof of mere disposition to devise by will or convey by deed by way of a gift, or as a reward for services, is insufficient. Applying those rules to the present case, we are of the opinion that the trial court was justified in denying the relief prayed for by plaintiff. True, the evidence showed that during the year she and Bill lived together after Gertrude married, she named Bill as beneficiary in a policy of insurance; she named him as co-owner in stock of the A. T. & T. Co. (Plaintiff had been employed by that company for many years.) Such acts were a continuation of the practices prevalent since 1941 when Bill purchased the home and his unmarried sisters lived with him. Plaintiff, so far as the record shows, was free to leave the home at any time. The record does not show wherein she gave up anything by reason of the alleged contract. She could change the beneficiaries in her insurance at any time, cash her bonds, or sell her stock. The trial court, on this question, found "That the acts constituting performance relied upon by plaintiff are ambiguous and are not solely and exclusively referable to the contract as alleged, and do not unequivocally point to the existence of any contract."

Plaintiff, in her brief, claims that the trial court overlooked the high degree of proof offered by her. It is claimed that her witnesses were testifying against their interests whereas the defendants were testifying to their own interests. We cannot say from this record that the trial judge did not consider all of the circumstances in connection with the interest of the two groups of witnesses. It is evident from the record that the sisters and brothers divided into two separate and distinct camps when the holographic will was found. The defendants who did not file answers were in favor of carrying out the wishes of their brother as expressed in the alleged will. The answering defendants wanted the property divided. One or two wanted the sister who lived in New York, Mrs. Blackbird, to have a greater share because, according to them, she was in need. The answering defendants went so far as to claim that the alleged will was a forgery. The weight of the evidence was that the writing and the signature were those of the deceased. It was shown that plaintiff, after this controversy arose, executed a will naming as her principal beneficiaries those who wanted her to have the property left by William.

Taking all of these circumstances into consideration, we are not justified in finding that the trial court did not consider all matters affecting the credibility of the witnesses. As we see it, the weakness of plaintiff's claim is inherent in the evidence offered to support the alleged contract. In these circumstances, we cannot set aside the judgment of the trial court.

It follows that the judgment must be and is hereby affirmed.

All concur.